IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WHIC LLC dba ALOHA TOXICOLOGY, | Civ. No. 18-00261 JMS-RLP |
| Plaintiff, | ORDER GRANTING PRELIMINARY INJUNCTION |
| vs. | |
| NEXTGEN LABORATORIES, INC.; OHANA GENETICS, INC.; HEIDI MAKI; STEPHANIE SIMBULAN; and DOE DEFENDANTS 1-20, | |
| Defendants. | |

## ORDER GRANTING PRELIMINARY INJUNCTION

## I. INTRODUCTION

Plaintiff WHIC LLC dba Aloha Toxicology ("Plaintiff" or "Aloha Toxicology") brings a Motion for Preliminary Injunction (the "Motion"), seeking to prevent Defendants NextGen Laboratories, Inc. ("NextGen"), Ohana Genetics, Inc. ("Ohana"),[1] Heidi Maki ("Maki"), and Stephanie Simbulan ("Simbulan")

---

[1] NextGen and Ohana are affiliated companies. During the relevant time period, NextGen purchased Ohana. For sake of clarity, the court will not distinguish between these two Defendants in this Order, and refers to them throughout as "Ohana/NextGen."

(collectively, "Defendants") from: servicing former Aloha Toxicology clients; employing former Aloha Toxicology employees; possessing, using, or disclosing Aloha Toxicology's "confidential/proprietary/trade secret information"; and unfairly competing with Aloha Toxicology. ECF No. 10 at 2-3. Further, the Motion asks this court to order Defendants to: (1) produce their client and employee lists for *in camera* review to assist the court in carrying out the preliminary injunction; and (2) account for and return Aloha Toxicology "confidential/proprietary/trade secret information." *Id.*

For the following reasons, the court GRANTS a preliminary injunction, and the Motion is GRANTED with relief limited as described below. Defendants are hereby ordered to comply with the preliminary injunction as follows:

- By October 5, 2018, Ohana/NextGen must discontinue servicing all former Aloha Toxicology clients (who were clients of Aloha Toxicology as of June 1, 2018).[2]

- Defendants shall send a notification by September 20, 2018 to any former Aloha Toxicology client (who was a client of Aloha Toxicology as of June 1, 2018) that is now serviced by Ohana/NextGen. The notification shall state that Ohana/NextGen may continue servicing these clients only until October 5, 2018. A copy of this Order shall be included with the notification.

_____

[2] This "grace period" is provided so that clients do not have a gap of service. To be clear, the clients are not required to return to Aloha Toxicology.

- Defendants shall send a copy of this Order by September 20, 2018 to any former Aloha Toxicology employee (who was employed by Aloha Toxicology as of June 1, 2018) who is now working at Ohana/NextGen.

- Defendants shall not utilize misappropriated trade secrets in any way, including to solicit any Aloha Toxicology client or employee (who was a client or employee of Aloha Toxicology as of June 1, 2018).

- Defendants shall discontinue and refrain from making any false statements about Aloha Toxicology, such as that Aloha Toxicology lost its certification, is shutting down, or was bought out by Ohana/NextGen.

## II. <u>BACKGROUND</u>

### A. Factual Background

The court does not recite all facts and evidence presented during four days of testimony, but rather outlines those facts and evidence needed to place the issues and the court's ruling in context.

Founded in 2006, Aloha Toxicology is a Hawaii business that provides drug testing services. Aloha Toxicology's collectors go to different client sites in Hawaii to collect urine samples and then deliver those samples to Aloha Toxicology's laboratory. The laboratory staff then tests the urine samples in a two-part process, a screening test followed by a confirmatory test using a mass spectrometer. The test results are then released to the clients.

Around 2014, Summit Diagnostics contracted to provide sales services for Aloha Toxicology.[3]  Maki was hired by Summit Diagnostics in April 2014 to help provide marketing services for several drug testing laboratories across the country.  In early 2015, Summit Diagnostics assigned Maki to focus solely on growing sales at the Aloha Toxicology laboratory in Hawaii.[4]  Maki's title at Aloha Toxicology was Sales and Operations Manager.

Maki (and later Simbulan when she started working for Aloha Toxicology) were aware of the Aloha Toxicology Employee Handbook.  The "Proprietary Information and Trade Secrets" section of the handbook provides:

> The Company's policy is to protect its non-public business trade information property.  Disclosure of confidential business trade information is in violation of the Company policy and may result in disciplinary action.  To avoid inadvertent disclosure of confidential business trade information, you should not discuss confidential business trade matters where others may overhear.  Information that the Company considers confidential business trade information includes, but is not limited to, the following:

---

[3]  The owners of Summit Diagnostics would later become the majority share owners of Aloha Toxicology in late 2015.

[4]  Although Maki was officially employed by Summit Diagnostics and received her paychecks from that company, Maki worked on behalf of, and was an agent of, Aloha Toxicology at all relevant times.

- Non-public, internal operations methods and strategies and financial data and reports;
- Customer name lists;
- Customer personal information (including address, telephone number, email address, and medical/health related information);
- Vendor lists;
- Pricing lists;
- Sales figures and profit/loss data;
- Marketing goals or figures;
- Strategic business plans;
- The Company's sources of leads for or methods of obtaining new business;
- Any software or computer programs owned or licensed by or to the Company, its customers, or suppliers;
- Employee addresses or phone numbers not obtained during the normal course of work activity;
- Confidential business trade information does not generally include information about employees' wages, hours, or terms and conditions of employment except that confidential wage and salary information obtained by an employee who knowingly possesses special custody of such information as part of his or her job duties and is tasked with keeping such information confidential may not be disclosed by such an employee; and
- Employee social security numbers and personal health information.

Plaintiff's ("Pl.") Ex. 19.

To find clients, Maki conducted Google searches and reviewed the

State of Hawaii's list of substance abuse treatment centers. Maki then reached out

to these potential clients, asked to speak with their program directors, and built relationships with those directors over time.  Maki built those relationships by making in-person visits, setting up educational opportunities for the clients (e.g., scheduling Aloha Toxicology's Lab Director to provide instruction), and explaining how test results worked.  Maki obtained information from the clients about what type of testing they wanted, such as which types of drugs the client wanted tested for by Aloha Toxicology.  Maki obtained a number of new clients, and as a result, there was a significant increase in the number of urine samples collected and tested.  In addition, Maki hired most of the collectors and either set their salaries or knew the amount of their salaries.

In mid-2017, Aloha Toxicology lost several members of its staff.  At that point, Dr. Joe El-Khoury ("Dr. El-Khoury"), Aloha Toxicology's Lab Director from December 2015 to July 2018, had to take a more active role in the laboratory.  Dr. El-Khoury, Co-Director of the Clinical Chemistry Laboratory at Yale University, was expected to work remotely, conducting in-person visits a few times a year.  Ronald Li ("Li"), who had been a processor at the laboratory, began to take on more responsibilities, both as a result of obtaining his clinical laboratory personnel license from the State of Hawaii and because the laboratory was under-staffed.  However, while Li had received his license, he did not yet have sufficient

skills and knowledge in using the mass spectrometer for confirmatory testing. After receiving his license, Li received some training in the confirmatory testing methods, but had not taken on the role of certifying scientist until Jennalyn Bishop ("Bishop") unexpectedly left the laboratory in September 2017. When Bishop left, Li became the sole certifying scientist at Aloha Toxicology. While outside services were brought in to continue to train Li, he struggled to learn how to use the mass spectrometer.

After recruitment by Maki, Simbulan began working at Aloha Toxicology in October 2017 as the Lab Coordinator. Simbulan's duties included the supervision of the day-to-day operations of the laboratory such as quality assurance, standard operating procedures, and compliance with audits.[5] Simbulan was also expected to help train Li in the use of the mass spectrometer, supervise Li, and report any issues to Dr. El-Khoury. According to Simbulan, the laboratory was in disarray when she started, and she spent the next few months trying to organize it.

In December 2017, Simbulan received a call from Aloha Toxicology's accrediting body, the College of American Pathologists ("CAP"), in which she

---

[5] Simbulan would later also take on administrative duties after another employee, Kawelo Malama, left Aloha Toxicology. Although Simbulan obtained her clinical laboratory personnel license from the State of Hawaii in January 2018, it does not appear that she actually certified test results, which remained Li's responsibility.

found out that CAP would be conducting an unscheduled inspection approximately one hour after the phone call.[6] The December 2017 unscheduled inspection was conducted because of a complaint lodged against Aloha Toxicology that was received by CAP. During the inspection, CAP found 22 deficiencies in the laboratory. Aloha Toxicology responded to CAP about each deficiency, as required, and worked to rectify the deficiencies. If Aloha Toxicology had not addressed the deficiencies to CAP, it could have lost its accreditation.

Aloha Toxicology also failed a CAP proficiency test[7] conducted during the last quarter of 2017. The laboratory reviewed its testing procedures and submitted its review to CAP. And as a result, Dr. El-Khoury required the lab to implement weekly external quality control tests. Dr. El-Khoury then visited the laboratory in January 2018, and learned that Li (who was responsible for the failed proficiency test) was also manually changing the test results from the confirmatory test to match the screening test. Li was apparently admonished, but not terminated.

---

[6] To operate in Hawaii, Aloha Toxicology must maintain a clinical laboratory license issued by the State of Hawaii. And to obtain a license, the laboratory must have accreditation from an approved accrediting body — Aloha Toxicology used CAP.

[7] CAP conducts quarterly forensic urine drug confirmation ("UDC") proficiency testing, in which CAP sends testing material to the laboratory, the laboratory tests the material and sends its results back to CAP, and then CAP checks the accuracy of the laboratory's results.

Sometime in early 2018, Ohana/NextGen began recruiting Maki to work for their company. Ohana/NextGen was expanding its drug testing services into the Hawaii market and was a direct competitor of Aloha Toxicology. Dr. El-Khoury testified that Maki started to recruit him to work for another drug testing business (presumably Ohana/NextGen), also in early 2018. In March 2018, Maki signed a contract with Ohana/NextGen, which required her to work full-time for Ohana/NextGen.[8] She was paid a base salary of $150,000 per year and 20% of the net profits from the business. At that time (and until June 26, 2018 when she resigned), Maki also continued her full-time position with Aloha Toxicology and was paid $100,000 per year and 10% of the gross profits from the business.[9] In short, Maki was dual-employed by two competitors between March and late June 2018, receiving two full-time salaries. And Maki never informed the owners of Aloha Toxicology about her dual-employment.

In April 2018, Maki emailed Dr. El-Khoury for advice on equipment purchases for Ohana/NextGen, which he provided. That same month, she also

---

[8] At some point, Maki became a Vice President at Ohana/NextGen.

[9] Dan Hlavachek ("Hlavachek"), an Aloha Toxicology owner, testified that Maki made over $400,000 a year for her work at Aloha Toxicology.

emailed Dr. El-Khoury an independent contractor agreement to work for Ohana/NextGen, which he never signed.[10]

Simbulan testified that Maki began recruiting her to work for Ohana/NextGen in April 2018. In May 2018, Simbulan signed a full-time employment agreement with Ohana/NextGen, with a start date of May 15, 2018. Simbulan began receiving her $100,000 annual salary from Ohana/NextGen, while simultaneously receiving her full-time salary of approximately $80,000 or $85,000 from Aloha Toxicology (until her June 29, 2018 resignation date). In short, Simbulan was dual-employed by two competitors between mid-May and June 26, 2018, receiving two full-time salaries. Like Maki, Simbulan never informed the owners of Aloha Toxicology about her dual-employment.

Li and Andrealle Okamura ("Okamura"), the Lab Technician at Aloha Toxicology, testified that in March or April 2018, Maki called a meeting with Simbulan, Li, and Okamura. According to Li and Okamura, Maki stated that Simbulan was working on a research project for the owners of the company and would need to start working from home most of the time.[11] Between March or

---

[10] Dr. El-Khoury ultimately never worked for Ohana/NextGen.

[11] Simbulan testified that no such meeting occurred, that she never said that she was working on a research project for the owners, and that she never heard Maki say that either. Simbulan also testified that she told Li and Okamura in May 2018 that Maki had asked Simbulan

(continued . . .)

April 2018 and June 26, 2018, Simbulan conducted much of her work for both her employers from home.

On June 6, 2018, CAP conducted its planned biannual accreditation inspection[12] and found seven deficiencies at Aloha Toxicology. The laboratory responded to six of the deficiencies and challenged one of the deficiencies, which CAP accepted. The lab had improved since the December 2017 unscheduled inspection, and its accreditation was renewed through 2020. In fact, Aloha Toxicology never lost its accreditation throughout the relevant time period.

But on June 9, 2018, CAP informed Simbulan that Aloha Toxicology had failed its second quarter UDC proficiency test. Simbulan informed Dr. El-Khoury, who had to decide by July 1, 2018 how to respond to CAP, either by choosing to: (1) continue testing at the lab, but submit a comprehensive corrective action plan with supporting documentation to CAP; or (2) voluntarily cease testing.

---

(. . . continued)
to help her with a project, and that Simbulan would be working from home. The court does not find Simbulan credible as to those statements.

[12] Every two years CAP conducts an inspection to renew accreditation. Every other year (when CAP is not conducting its inspection), the lab must do its own self-inspection using a CAP checklist.

Dr. El-Khoury did not immediately reply to CAP,[13] but rather, on June 9, 2018, Dr. El-Khoury emailed Simbulan and Maki, instructing them that the laboratory must cease testing and send samples to Aloha Toxicology's reference lab,[14] Cordant, until an investigation was conducted.[15] Dr. El-Khoury testified, and Simbulan confirmed in her testimony, that Dr. El-Khoury was surprised by the failed proficiency test because the lab was supposed to be conducting weekly external quality control checks. Maki admitted in her testimony that (while dual-employed) instead of sending the samples to Cordant, she (after consultation with others) directed the laboratory staff, including Simbulan, to send the samples to Ohana/NextGen.[16]

On June 18, 2018, Maki held a meeting with Simbulan, Li, and Okamura about the status of the laboratory. Maki testified that she told them that

---

[13] In fact, Dr. El-Khoury never filed a cease-testing notice with CAP.

[14] Dr. El-Khoury testified that a reference lab is where the referring lab sends samples in the event the referring lab is unable to test or the referring lab does not perform certain testing in-house.

[15] In his email, Dr. El-Khoury stated, "We must cease testing today and send all the samples out to our reference lab until our investigation is complete and we know what the causes of our failures were and have addressed them." Pl.'s Ex. 22.

[16] Maki testified that she was not able to get in touch with Cordant, so she sent the samples to Ohana/NextGen. The court does not find Maki credible on this matter. *See infra* Discussion Section, Part A.

the laboratory would likely be shut down for six months and that it was in their best interest to look for other employment.[17]  Okamura testified that Maki went further than this by stating that she was uncertain if the lab would ever continue testing again.  Okamura also testified that Maki explained that they would be paid through the end of the month.  Li testified that Maki said: (1) the owners wanted to shut the laboratory down; and (2) Li and Simbulan should resign to prevent anything from happening to their licenses.  After the meeting, Simbulan and Li emailed their resignation letters to Maki, stating that their end dates were June 29, 2018.

Maki testified that on June 18, 2018 she contacted or tried to contact all of Aloha Toxicology's clients to tell them that she was moving to Ohana/NextGen and she wanted the clients to come with her.  On or around June 18, 2018, Maki also called various collectors about the status of the laboratory.  Joshleen Baker, an Aloha Toxicology collector, testified by declaration that Maki called her and told her that: (1) Aloha Toxicology was under new ownership; (2) Aloha Toxicology owners were bought out by a new company; and (3) she would be working for the new company.  Ohana/NextGen then sent a new-hire packet to Baker.  Carrie Leaialoha and Kuhio Kapololu, also collectors for Aloha

---

[17]  Maki's testimony is not credible on this matter.

Toxicology, testified by declaration to having essentially the same experience with Maki.

Dr. El-Khoury testified that on June 18, 2018, Maki told him that the owners of Aloha Toxicology wanted to shut down the lab. Dr. El-Khoury sent an email to Maki on June 21, 2018 asking her if she had written confirmation that the owners were shutting down the lab, so that he could decide whether to formally file the cease-testing notification with CAP. Pl.'s Ex. 28. Dr. El-Khoury never received written confirmation from Maki.

Kiralee Ma-e ("Ma-e"), who works for a client of Aloha Toxicology, received an email on June 21, 2018 from Ohana/NextGen with log-in information to retrieve lab test results. Pl.'s Ex. 44. Ma-e testified that she was confused by the email, so she emailed Maki. *See id.* Maki replied via email, "The short answer is Aloha Tox got purchased by another company and our name is changing to Ohana Laboratory's [sic]." *Id.* During her testimony, Maki admitted that this statement was false. Ma-e testified that she also spoke with Maki on the phone, and during the call Maki reiterated that Aloha Toxicology was being bought out by Ohana/NextGen.

On June 22, 2018, according to Hlavachek, Maki told him on the phone that Simbulan's husband, who serves in the military, had taken a job transfer

to Europe, so Simbulan would be leaving Aloha Toxicology.[18]  Hlavachek testified

that Maki then said that she was concerned that Li was probably going to resign,[19]

and Hlavachek then replied that if Li did resign, the lab would have to send off its

samples to Aloha Toxicology's reference lab, Cordant, for testing.  Maki then

emailed Hlavachek on June 25, 2018: "I informed the staff today of Stephanie's

resignation, shortly after Ron resigned."  Pl.'s Ex. 30.  Hlavachek testified that

Maki called him on June 25, 2018 to tell him that Li had resigned.

Dwayne Kojima, Substance Abuse Program Manager for the State of

Hawaii's Department of Public Safety ("DPS"), testified that Maki called him on

June 24, 2018.  At that time, DPS was an Aloha Toxicology client.  Kojima

testified that Maki told him that: (1) Aloha Toxicology could not perform the

confirmation testing for DPS; (2) Aloha Toxicology employees were leaving for

another company; and (3) Maki could send him information about

Ohana/NextGen, who could perform the confirmatory testing for DPS.  Kojima

testified that he asked to get clarification via email on what led to Aloha

Toxicology's inability to conduct testing, but that Maki said she wanted to talk on

the phone.  According to Kojima, Maki then said (on the phone) that Aloha

---

[18]  Maki denies that she told anyone that Simbulan's husband was being transferred to Europe.  The court does not find her credible on this matter.

[19]  Li had already submitted his resignation on June 18, 2018.  Pl.'s Ex. 24.

Toxicology lost its certification and rather than remedy the situation, the owners were going to shut down the laboratory.[20]

On June 26, 2018, Maki resigned from her job at Aloha Toxicology by email, stating that she was leaving because Aloha Toxicology was no longer a viable business due to the failed CAP proficiency test, loss of "key lab personnel," and that the lab could not test samples. Pl.'s Ex. 30. On the same day, Dr. El-Khoury gave his 30-day notice of resignation by email. Defendant's Ex. 15. In his resignation, Dr. El-Khoury stated that the lab could resume testing once testing personnel demonstrate competency and successfully show CAP proficiency, as accepted by a new lab director. *Id.*

Since that date, the owners of Aloha Toxicology and their agents reached out to Li and Okamura, told them the laboratory was not closing, and hired both of them back. They also reached out to their former clients and a few clients with smaller accounts have returned to Aloha Toxicology. They reached out to Dr. El-Khoury, who, when he found out the owners were not planning to shut down the laboratory, worked to help them get the laboratory back in order. And they hired Elite Diagnostics, a consulting company, who worked with Dr. El-Khoury to

---

[20] In her testimony, Maki disputes much of Kojima's testimony. Again, the court does not find her credible.

fix the testing problems and prepare the CAP documents. Dr. El-Khoury extended his resignation date in order to help the owners, and CAP extended its deadlines so that Aloha Toxicology could properly prepare responses to the UDC proficiency test failure, which were submitted on July 26, 2018.

But Ohana/NextGen and Maki have continued their interference with Aloha Toxicology's business. Dr. El-Khoury testified that in early July, Maki asked if Dr. El-Khoury would send her the CAP Proficiency Testing Compliance Notice (the form he was supposed to send to CAP after the failure of the second quarter UDC proficiency test). He refused, saying that it was confidential information of Aloha Toxicology. On August 3, 2018, Erik Vargas of Ohana/NextGen sent out a marketing email stating, "Ohana Labs (*formerly Aloha Toxicology*) is hosting their annual dinner at Morton's." Pl.'s Ex. 35 (emphasis added).

Aloha Toxicology had 13 clients before Ohana/NextGen and Maki began taking its clients. A few clients with smaller accounts have returned to Aloha Toxicology. A few clients have gone with other competitors. Ohana/NextGen currently has six clients: Hina Mauka, Lokahi, Champ Clinic, Poʻailani, Hope, Inc., and Mental Health Kokua. All of those clients were clients of Aloha Toxicology as of June 1, 2018.

**B. Procedural History**

On July 5, 2018, Plaintiff filed a nine-count Verified Complaint, seeking damages and injunctive relief. ECF No. 1. NextGen and Ohana answered on July 31, 2018, and Simbulan answered on August 2, 2018.[21] ECF Nos. 17, 20. On July 23, 2018, Plaintiff filed its Motion for Preliminary Injunction. ECF No. 10. Defendants' Opposition was filed on August 13, 2018. ECF No. 26. Plaintiff's Reply was filed on August 16, 2018. ECF No. 33. Hearings on this Motion were held on August 22 and September 4, 11, 12, 2018. Plaintiffs filed an Amended Complaint on September 12, 2018, solely to clarify and allege that conduct occurred in interstate commerce. ECF No. 54. The court heard testimony from eight witnesses, reviewed the declarations of three witnesses, and admitted numerous exhibits into evidence.

## III. STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). It "should not be granted unless the movant, by a clear showing, carries

---

[21] Maki filed a motion to dismiss for lack of jurisdiction, ECF No. 25, which was denied on September 13, 2018 because the complaint was amended.

the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (internal quotation marks, emphasis, and citations omitted).

To obtain a preliminary injunction, a plaintiff "must establish that [plaintiff] is likely to succeed on the merits, that [plaintiff] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [plaintiff's] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. As to the first factor, "if a plaintiff can only show that there are 'serious questions going to the merits' — a lesser showing than likelihood of success on the merits — then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)); *see also Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (reiterating the lesser "serious questions going to the merits" analysis). "The elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez*, 680 F.3d at 1072. All four elements must be established. *DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir. 2011).

# IV. **DISCUSSION**

## A.    Credibility

The court begins with a discussion of credibility before addressing the *Winter* factors.  And the court concludes that Maki and Simbulan were not, on the whole, credible witnesses.  Although Maki testified falsely on several occasions, Maki provided truthful testimony on at least several key points.  First, she readily admitted that she began to work as a paid "consultant" for Ohana/NextGen in mid-March 2018 while still employed at Aloha Toxicology.  Her consultant work for Ohana/NextGen was in direct conflict with Aloha Toxicology's interests because Ohana/NextGen was in the same business and was planning to open a lab in Honolulu in direct competition with Aloha Toxicology.  Then, on May 29, 2018, Maki became an Ohana/NextGen employee, again while also employed by Aloha Toxicology (and, again, receiving compensation from two competing employees).  She resigned from Aloha Toxicology on June 26, 2018.

Maki further explained that on or about June 18, 2018, while still employed by Aloha Toxicology (but of course, while also employed by Ohana/NextGen), she contacted or attempted to contact all of Aloha Toxicology's clients and told them that she was moving to Ohana/NextGen and she wanted the clients to come with her.  But past this admission, Maki's claims as to the nature of

those conversations were simply fictitious. It is clear that Maki lied about Aloha

Toxicology in order to try to get Aloha Toxicology's clients to switch their

business to Ohana/NextGen. For example, Maki spoke with Aloha Toxicology

client Kojima, who is the Substance Abuse Program Manager at DPS, on June 24,

2018. Kojima credibly testified that in seeking DPS business for Ohana/NextGen,

Maki told him that Aloha Toxicology could not conduct confirmation testing for

DPS because the laboratory had lost its certification, all the employees were

leaving to go to another company, and the owners were going to shut down Aloha

Toxicology. While testifying, Maki falsely denied making these statements.[22] Dr.

El-Khoury credibly explained that during a June 18, 2018 phone conversation,

Maki stated that the owners wanted to shut down the laboratory's operation.

Again, in her testimony, Maki denied making this statement.[23]

And Maki testified falsely as to other material matters. For example,

she testified that once the decision was made in mid-June 2018 to send Aloha

---

[22] Maki told a different lie to Aloha Toxicology client Ma-e of Ohana Counseling Services (unrelated to Ohana/NextGen) as to why Aloha Toxicology was shutting down its operation. In a June 22, 2018 email, Maki told Ma-e that "Aloha Tox got purchased by another company and our name is changing to Ohana Laboratory's [sic]." Pl.'s Ex. 44 at AT000169.

[23] Maki also caused this lie to be reflected in a proposed response to the CAP Proficiency Testing Compliance Notice. Pl.'s Ex. 21. That form states, in part, that "Certifying scientist left the company and the owner has decided to shut down the laboratory." Simbulan explained that she wrote this notation at Maki's specific direction.

Toxicology's samples to the mainland for confirmatory testing, she attempted to contact Aloha Toxicology's reference lab, Cordant, but could not reach anyone. But both Li and Simbulan testified that Maki told them that she was able to speak to someone at Cordant, but Cordant was unable to handle the volume of Aloha Toxicology's samples. Further, Maki then decided to send the samples to Ohana/NextGen, her other full-time employer and a direct competitor to Aloha Toxicology.

Simbulan, like Maki, provided some truthful testimony. For example, Simbulan admitted that she worked for Ohana/NextGen and Aloha Toxicology, full-time and simultaneously, from at least May 16 to June 20, 2018. She also testified, truthfully, that while she was dual-employed she sent Aloha Toxicology samples to Ohana/NextGen on the mainland for testing.

But, like Maki, she also testified falsely on several material matters. For example, Li credibly testified that during a meeting in approximately March 2018, Maki explained to employees that Simbulan would be out of the office for a considerable amount of time to work on a research project for Aloha Toxicology's investors. Another credible witness, Okamura, provided similar testimony — that in March or April 2018, Maki informed employees that one of Aloha Toxicology's owners had a marketing research project that required Simbulan to be out of the

office.  Simbulan, however, denied that this meeting took place.  Simbulan also testified that when she was dual-employed, she worked for Ohana/NextGen from approximately 5:00 a.m. to 9:00 a.m., and then worked for Aloha Toxicology from approximately 9:00 a.m. until 5:00 p.m.  When the court inquired why, if she worked 8 hours per day for Aloha Toxicology that she had to work at home, Simbulan then admitted that she also conducted work for Ohana/NextGen during normal business hours.

In short, although Maki and Simbulan both testified truthfully as to some matters, the court determines based on demeanor, manner of testimony, and credible testimony to the contrary, that Maki and Simbulan were not credible witnesses.  The court takes these credibility determinations into account in the remainder of its analysis.

## B.    *Winter* Factors

Although the Motion and testimony at the hearing addressed several Counts of the Complaint — e.g., Counts I and II (misappropriation of trade secrets under 18 U.S.C. § 1836 and HRS ch. 482B), Count IV (breach of duty of loyalty), Count V (unfair competition under HRS ch. 480-2), and Count VI (tortious interference with contract) — this Order focuses on the two trade secret Counts, which were both asserted against all Defendants.

The court has carefully considered the evidence, including the manner, demeanor, and nature of witness testimony, and analyzed the relevant legal authorities. As to the two trade secret Counts, Plaintiff has met its burden to satisfy all four *Winter* factors, and as interpreted by the Ninth Circuit in *Alliance for the Wild Rockies*.[24] That is, Plaintiff has established that (1) it is likely to succeed on those counts, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20.

The court has given considerable thought to the likelihood-of-success prong and recognizes that (given the nature of the trade secrets at issue) it presents a closer call than the other three *Winter* factors, which easily favor Plaintiff. Nevertheless, at minimum, Plaintiff has certainly demonstrated that there are "serious questions going to the merits" as to whether Defendants misappropriated trade secrets. And given that lesser showing, the court would still issue a

---

[24] As stated in open court on September 12, 2018, it is abundantly clear that Maki and Simbulan violated their duties of loyalty to Plaintiff as alleged in Count IV. It appears equally clear that Maki (and perhaps Simbulan as well) tortiously interfered with contractual relations as alleged in Count VI. It is, however, unclear (at least on the current record) whether Ohana/NextGen can be enjoined based on such violations — Counts IV and VI were asserted only against Maki and Simbulan (not against Ohana or NextGen). But because the court grants relief on Counts I and II, the court need not reach this issue. Likewise, the court need not reach at this stage whether state law claims are preempted by the Hawaii Uniform Trade Secrets Act, or whether Plaintiff is likely to succeed on its chapter 480 unfair competition claim.

preliminary injunction because the "balance of hardships tips *sharply* in plaintiff's favor, and the other two *Winter* factors [(irreparable harm and public interest)] are satisfied." *Alliance for the Wild Rockies*, 632 F.3d at 1135.

The court now explains its reasoning.

**1.      Likelihood of Success on Misappropriation of Trade Secrets Claims**

As explained above, Plaintiff brings two counts of misappropriation of trade secrets against all Defendants — one count pursuant to 18 U.S.C. § 1836 and one count pursuant to HRS Chapter 482B.

*a.      Federal law — the Defend Trade Secrets Act*

Title 18 U.S.C. § 1832, entitled "[t]heft of trade secrets," makes the following (among other acts) illegal:

(a) Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly—

(1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;

(2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information[.]

25

Under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b) allows for private civil actions to enforce § 1832. *See* § 1836(b)(1) ("An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.").  And § 1836(b)(3) allows the court to issue injunctions for misappropriations of trade secrets, providing in pertinent part:

> In a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court may—
>
> (A) grant an injunction—
>
> (i) to prevent any actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable, provided the order does not—
>
>> (I) prevent a person from entering into an employment relationship, and that conditions placed on such employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows; or
>>
>> (II) otherwise conflict with an applicable State law prohibiting restraints on the practice of a lawful profession, trade, or business;
>
> (ii) if determined appropriate by the court, requiring affirmative actions to be taken to protect the trade secret[.]

In turn, § 1839(5) defines "misappropriation," in part, as:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who—
>
>> (i) used improper means to acquire knowledge of the trade secret;
>>
>> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
>>
>>> (I) derived from or through a person who had used improper means to acquire the trade secret;
>>>
>>> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>>>
>>> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret[.]

And finally, § 1839(3) defines a "trade secret" in part as:

> [T]he term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized

physically, electronically, graphically, photographically, or in writing if—

> (A) the owner thereof has taken reasonable measures to keep such information secret; and

> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

b.    *Hawaii's Uniform Trade Secrets Act*

Hawaii has similar statutory protections against misappropriation of trade secrets in the Hawaii Uniform Trade Secrets Act ("HUTSA"), HRS ch. 482B. Indeed, the parties agree that the analysis is essentially the same under either regime. *See, e.g.*, *Veronica Foods Co. v. Ecklin*, 2017 WL 2806706, at *13 (N.D. Cal. June 29, 2017) ("Due to the overlap between the statutes, several courts have addressed DTSA claims in conjunction with claims under the [California Uniform Trade Secrets Act] and other states' versions of the Uniform Trade Secrets Act."). And in any event, the court issues this injunction under either or both regimes.

Like 18 U.S.C. § 1836, HRS § 482B-3(a) provides that "[a]ctual or threatened misappropriation may be enjoined." And § 482B-3(c) specifies that "[i]n appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order."

Hawaii law defines "misappropriation" nearly identically as does 18

U.S.C. § 1839(5). Misappropriation is defined, in part, as:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
>> (A) Used improper means to acquire knowledge of the trade secret; or
>>
>> (B) At the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:
>>
>>> (i) Derived from or through a person who had utilized improper means to acquire it;
>>>
>>> (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>>>
>>> (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use[.]

HRS § 482B-2.

In this regard, HUTSA specifies that "improper means" under the

statute (e.g., a person used "improper means to acquire knowledge of the trade

secret") "includes theft, bribery, misrepresentation, breach or inducement of a

breach of a duty to maintain secrecy, or espionage through electronic or other

means." *Id.* And it defines a "trade secret" as follows:

> "Trade secret" means information, including a formula,
> pattern, compilation, program[,] device, method,
> technique, or process that:
>
> > (1) Derives independent economic value, actual or
> > potential, from not being generally known to, and
> > not being readily ascertainable by proper means
> > by, other persons who can obtain economic value
> > from its disclosure or use; and
> >
> > (2) Is the subject of efforts that are reasonable
> > under the circumstances to maintain its secrecy.

*Id.*

c.     *Application of statutory provisions*

"To prevail on a HUTSA claim, a plaintiff must establish that there

exists a trade secret and a misappropriation of that trade secret." *BlueEarth*

*Biofuels, LLC v. Hawaiian Elec. Co.*, 780 F. Supp. 2d 1061, 1078 (D. Haw.

2011).[25] The parties focus on whether Plaintiff has proven that "trade secrets" are

at issue. That is, there is no serious dispute that, for present purposes,

"misappropriation" of Plaintiff's information was acquired by Defendants by

improper means.

---

[25] Again, the parties do not dispute that the same elements must be proven under federal
law.

Plaintiff has proven that Maki — acting in a capacity as an agent of Ohana/NextGen (whether as its "consultant" or a vice-president) while simultaneously and surreptitiously continuing to work for Plaintiff — took by improper means confidential client information, including points-of-contact, emails, phone numbers, knowledge of client's needs and practices, and confidential collector information (all information that required considerable investment of time and resources by Plaintiff, and much of which as a whole would not be known to the public). Each client had individualized needs, for example: (1) clients may only want Aloha Toxicology to test for certain drugs; (2) not all clients needed Aloha Toxicology to provide collectors to obtain the urine samples; and (3) some clients wanted Aloha Toxicology to provide education on the testing process. If a client used a collector, the client often wanted to continue to use the same collector. Maki used her knowledge of the salary and job positions of the collectors to bring those collectors over to Ohana/NextGen.

This is all information that Plaintiff, through its employee handbook, took reasonable measures to secure. Maki did so knowingly and, at minimum, in violation of duties to maintain secrecy prescribed in that employee handbook. *See* 18 U.S.C. § 1839(5); HRS § 482B-2. And Ohana/NextGen acquired that information because Maki (especially as one of its vice-presidents) was its agent.

*See, e.g.*, *State v. Hoshijo ex rel. White*, 102 Haw. 307, 319, 76 P.3d 550, 562 (2003) ("It is well established that 'a master is subject to liability for the torts of his or her servants committed while acting in the scope of their employment.'") (citations and square brackets omitted); *Taniguchi v. Ass'n of Apt. Owners of King Manor, Inc.*, 114 Haw. 37, 50,155 P.3d 1138, 1151 (2007) ("[A] corporate officer is an agent for his corporate principal.") (citation and editorial marks omitted).

The court thus turns to whether "trade secrets" are at issue. Defendants argue that "[a] client list is not a *per se* 'trade secret' under Hawaii law." ECF No. 26 at 25. And the court agrees that such a list *by itself* is not generally protected as a trade secret, especially where such information is otherwise readily available in the public domain. But such client information can still be protected as a trade secret depending on the circumstances — especially if coupled with other confidential knowledge "such as sales history and customer needs and preferences." *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1076 (N.D. Cal. 2016) (citing *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993)). *See also, e.g.*, *BlueEarth Biofuels*, 780 F. Supp. 2d at 1079 (finding "that the contact list here alleged is similar to a customer list, which courts generally find to be protected as a trade secret," reasoning that "the contact list as alleged has significant economic value because it allows a company or business

that would otherwise not have this information [to] gain a distinct advantage through familiarity with the business community") (citations omitted); *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192, 1214 (N.D. Cal. 2012) (reiterating that "confidential customer-related information including customer lists and contact information, pricing guidelines, historical purchasing information, and customers' business needs/preferences" is the "type of information [that] is routinely given trade secret protection") (citations omitted).

Such information about customers' needs and preferences "has potential or actual value from not being generally known to the public: information about customers' preferences can aid in 'securing and retaining their business.'" *A10 Networks, Inc.*, 873 F. Supp. 2d at 1214 (quoting *Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 972 (C.D. Cal. 2011)). Although the court certainly agrees that courts "are reluctant to protect customer lists to the extent that they embody information that is readily ascertainable through public sources," *West Plains, L.L.C. v. Retzlaff Grain Co.*, 927 F. Supp. 2d 776, 783 (D. Neb. 2013) (citation and quotation marks omitted), much more than just public information is at issue here. Rather, the information misappropriated by Maki (on behalf of Ohana/NextGen) — customer data, history, needs and preferences, and collector

information — is much more like that in *Retzlaff Grain*, where the district court

found a likelihood of success on a misappropriation claim involving customer lists:

> But where time and effort have been expended to identify
> particular customers with particular needs or
> characteristics, courts will prohibit others from using this
> information to capture a share of the market. . . .  Such
> lists are distinguishable from mere identities and
> locations of customers that anyone could easily identify
> as possible customers.

927 F. Supp. 2d at 783-84 (quoting *Home Pride Foods, Inc. v. Johnson*, 634

N.W.2d 774, 782 (Neb. 2001)).

> As explained by the Eighth Circuit,

> Compilations are specifically contemplated in the
> [Uniform Trade Secrets Act] definition of a trade secret,
> and the fact that some or even most of the information
> was publicly available is not dispositive of the first factor
> in the UTSA definition.  Compilations of non-secret and
> secret information can be valuable so long as the
> combination affords a competitive advantage and is not
> readily ascertainable.  Compilations are valuable, not
> because of the quantum of secret information, but
> because the expenditure of time, effort, and expense
> involved in its compilation gives a business a competitive
> advantage.

*AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 972 (8th Cir.

2011) (citing *Amoco Prod. Co. v. Laird*, 622 N.E.2d 912, 919-20 (Ind. 1993)); *see*

*also, e.g.*, *Morlife, Inc. v. Perry*, 66 Cal. Rptr. 2d 731, 735 (Cal. Ct. App. 1997)

(reasoning that "courts are reluctant to protect customer lists to the extent they

embody information which is 'readily ascertainable' through public sources," but where plaintiff "has expended time and effort identifying customers with particular needs or characteristics, courts will prohibit former employees from using this information to capture a share of the market"); *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1089 (E.D. Cal. 2012) ("[W]here the party compiling the customer lists, while using public information as a source, . . . expends a great deal of time, effort and expense in developing the lists and treats the lists as confidential in its business, the lists may be entitled to trade secret protection.") (quoting *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.,* 147 F. Supp. 2d 1057, 1066 (D. Kan. 2001)).

Moreover, although there is no evidence that Maki or Simbulan took any files or written compilations of data, there certainly is evidence that Maki — as the main client contact and face of Aloha Toxicology — possessed such confidential information, which was developed over years with the company. *See A10 Networks*, 873 F. Supp. 2d at 1215 ("[T]he mere fact that the information is not in a written list is not dispositive[.]").

> [T]he [Uniform Trade Secrets Act] does not preclude former employees from using general knowledge, skill and experience acquired while working for a former employer in order to compete against that employer. However, the UTSA does preclude former employees from using trade secrets during such competition, *even*

> secrets that have not been reduced to writing and are
> carried solely in the employee's mind.

*Excelligence Learning Corp. v. Oriental Trading Co.*, 2004 WL 2944048, at *3

(N.D. Cal. Dec. 20, 2004) (citing *Morlife*, 66 Cal. Rptr. 2d at 736) (emphasis

added).

Defendants rely heavily on this court's decision in *Standard Register

Co. v. Keala*, 2014 WL 3420785 (D. Haw. July 11, 2014), which denied a motion

for temporary restraining order where customer lists were at issue. But *Keala* is

easily distinguishable, and in fact is completely consistent with the result in the

instant case. The denial in *Keala* was based on lack of *evidence*, not on a legal

theory that customer lists could not be trade secrets. *See id.* at *8 ("[T]he court's

determination that Plaintiffs have failed to carry their burden on the Motion for

TRO does not mean that Defendants did not misappropriate trade secrets. Rather

Plaintiffs have simply not carried their burden on the record presented."). Indeed,

this court recognized that customer lists *can* in fact constitute trade secrets in

certain circumstances. *See id.* at *7 ("Although this information may in fact

qualify as trade secrets (and the Individual Defendants' agreements acknowledge

that this information qualifies as such), Plaintiffs have provided scant evidence that

this is actually the case."); *id.* at n.10 (distinguishing between customer lists that

embody readily available public information, and lists that have identified

"customers with particular needs or characteristics").  Unlike in *Keala*, Plaintiff here has met its burden to provide sufficient evidence establishing that it is likely to succeed on its claim that trade secrets were misappropriated.

> d.  *"Serious questions going to the merits"*

Despite the court's finding that Plaintiff has established a likelihood of success on the misappropriation claims, the court nevertheless recognizes that there is no evidence that Maki or Simbulan took any *other* confidential information from Plaintiff besides customer information and information about collector's employment.  There is, for example, no evidence that Defendants misappropriated Plaintiff's confidential scientific testing methods.  And the evidence that Maki misappropriated information about customers' needs or preferences and sales history is largely inferential (although obvious).  The court thus acknowledges that this first prong presents a relatively "close call" — especially when contrasted to the other three prongs of *Winter*, which are easily satisfied.

But even if the evidence is mixed as to whether Plaintiff is likely to succeed in ultimately proving the trade secrets issue, the evidence certainly establishes at least "serious questions going to merits" on this question.  This "serious questions" inquiry is a "lesser showing than likelihood of success on the merits."  *Shell Offshore, Inc.*, 709 F.3d at 1291.  And since, at minimum, Plaintiff

has at least established that there are "serious questions" as to whether trade secrets are at issue, the court could (and will) still grant an injunction if the balance of hardships tips sharply in Plaintiff's favor and the other two *Winter* factors are satisfied. *See Alliance for the Wild Rockies*, 632 F.3d at 1135. Further, a stronger showing in other prongs may (and does) offset a weaker showing in the first prong. *Lopez*, 680 F.3d at 1072. The court thus turns to other factors of the *Winter* test.

## 2. *Irreparable Harm*

Plaintiff is likely to suffer irreparable harm in the absence of preliminary relief. *Winter*, 555 U.S. at 20. It has lost at least six clients (at least some of which are large accounts) to Ohana/NextGen because of Maki's misappropriation, and all of Ohana/NextGen's clients are former clients of Plaintiff. Maki used the misappropriated information to contact Plaintiff's clients to recruit them by, among other things, lying to them about Plaintiff's viability. Maki and Ohana/NextGen falsely told clients and collectors various stories, including that Aloha Toxicology lost its certification, the owners were shutting down the laboratory, and that Aloha Toxicology was bought out by Ohana/NextGen. At best, clients and collectors are confused as to whether Aloha Toxicology is still an independent, functioning business; at worst, clients think that the laboratory lost its accreditation and cannot be trusted to (and is not allowed to)

provide accurate test results.  Plaintiff thus lost and will continue to lose goodwill in the eyes of customers and collectors.  "Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (citation omitted).  "[T]he loss of clients and market share is not economic loss that can be fully compensated by a damage award," *UARCO Inc. v. Lam*, 18 F. Supp. 2d 1116, 1125 (D. Haw. 1998), and can constitute "irreparable harm."  "Evidence of loss of control over business reputation and damage to goodwill [can] constitute irreparable harm."  *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.,* 736 F.3d 1239, 1250 (9th Cir. 2013).  In short, Plaintiff has satisfied this prong.

### 3.    *Balance of Hardships/Equities*

"To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it."  *Univ. of Hawaii Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999).  And generally the balance of hardships tips in a plaintiff's favor when an injunction would "do no more than require Defendant to comply with federal and state laws."  *Schein*, 191 F. Supp. 3d

at 1077 (quoting *Dish Network L.L.C. v. Ramirez*, 2016 WL 3092184, at *7 (N.D. Cal. June 2, 2016)) (ellipses omitted).

Applying *Cayetano* here, Plaintiff has established that it lost almost its entire client base because of Defendants' misappropriation. It has established that its reputation and goodwill was severely if not yet irreparably harmed. And balancing that harm to Plaintiff against the nature of Defendants' actions in causing it, the court concludes that the balance of hardships not only tips in favor of Plaintiff, but does so *sharply*. *See Alliance for the Wild Rockies*, 632 F.3d at 1135.

If the court refuses to enter an appropriate injunction, Plaintiff will have been harmed based on Defendants' (primarily Maki's) misappropriation — again, through which she was able to solicit Plaintiff's clients by lying about Plaintiff's business (e.g., telling them that Plaintiff was losing its certification or shutting down, or that it was being bought out by Ohana/NextGen). And if the court refuses to enter an injunction, Defendants will have succeeded in obtaining Plaintiff's clients by egregious and outrageous subterfuge. Although Defendants might be harmed by issuance of an injunction, it would be harm that is totally self-inflicted and would be caused by their own improper actions. When balancing these *equities*, the court easily concludes that they tip *decidedly* and *sharply* in

favor of Plaintiff — the possibility of harm to Plaintiff without an injunction is great, and the possible actual harm to Defendant is low. *See Cayetano*, 183 F.3d at 1108.

### 4. *Public Interest*

Finally, it is in the public interest to issue this injunction (under terms set forth below). *See, e.g.*, *Schein*, 191 F. Supp. 3d at 1078 ("Public interest is also served by enabling the protection of trade secrets."). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982)). "The public interest inquiry primarily addresses [the] impact on non-parties rather than parties." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002), *abrogated on other grounds by Winter*, 555 U.S. at 22. Given those considerations, the court addresses Defendants' arguments to limit the scope in some detail.

Defendants argue that its clients "have the right to choose who to do business with" and its employees "have the right to choose who to work for." ECF No. 26 at 47. Defendants assert that Plaintiff cannot "force" clients and employees to return to Plaintiff. *Id.* Defendants also argue that the quality of Aloha

Toxicology's services is lacking, and it would not be in the public interest for clients and employees to return to Aloha Toxicology. *Id.* at 47-48. The court agrees only insofar as it will not "force" clients to return to Aloha Toxicology. Instead, the court is enjoining Ohana/NextGen from engaging in certain conduct.

Employees can choose to stay at Ohana/Next Gen, seek employment at Aloha Toxicology, or seek employment at another company. Some employees, like Li and Okamura, have already chosen to return to Aloha Toxicology upon hearing the truth of the situation.

Clients can choose to go back to Aloha Toxicology or they can choose to go to a different company. In fact, some clients, having learned of the false statements from Maki and Ohana/NextGen, have already chosen to either go back to Aloha Toxicology or go to a different competitor. For example, Ma-e testified that Ohana Counseling Services has returned to Aloha Toxicology, and Kojima has testified that DPS has chosen a competitor from the mainland.

This case is distinguishable from those cases where courts did not enjoin defendants who misappropriated trade secrets from servicing plaintiffs' former clients. In cases like *Corporate Technologies, Inc. v. Harnett*, 943 F. Supp. 2d 233, 236-37, 245-46 (D. Mass. 2013), while the misappropriated trade secrets were used to contact clients in order to get their business, the misappropriated trade

secrets were not utilized to spread injurious and misleading false statements about the plaintiff company. *See also Am. Family Mut. Ins. Co. v. Hollander*, 2009 WL 535990, at *1-5, *20 n.25 (N.D. Iowa Mar. 3, 2009), *report and recommendation adopted*, 2009 WL 1251925 (N.D. Iowa May 6, 2009); *SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 703-705, 716 (N.D. Ill. 2009); *BNY Mellon, N.A. v. Schauer*, 2010 WL 3326965, at *1-8 (Mass. Super. May 14, 2010).

Ohana/NextGen and Maki utilized misappropriated trade secrets and spread false statements that were extremely injurious to Aloha Toxicology. Maki and other agents of Ohana/NextGen told clients and employees of Aloha Toxicology false statements, including that Aloha Toxicology lost its certification, the owners were shutting down the laboratory, and that the business was bought out by Ohana/NextGen. It is in the clients' interest to discontinue their current association with Ohana/NextGen, whose client list was built on misappropriated trade secrets and material false statements. Further, it is in the general public interest to deter companies for taking misappropriated trade secrets and utilizing those secrets to spread injurious and misleading false statements in order to solicit business and poach employees.

Accordingly, the court finds that the public interest factor is satisfied.

## C.     Scope of Injunction

"A federal court may issue an injunction if it has personal jurisdiction over the parties and subject matter jurisdiction over the claim; it may not attempt to determine the rights of persons not before the court." *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1985).  "A preliminary injunction should be used only to maintain the status quo." *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004).  "The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy.'" *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963)).  "[A]n injunction must be narrowly tailored 'to affect only those persons over which it has power,' and to remedy only the specific harms shown by the plaintiffs, rather than 'to enjoin all possible breaches of the law.'" *Price*, 390 F.3d at 1117 (quoting *Zepeda*, 753 F.2d at 727, 728 n.1) (internal citations omitted).

Plaintiff seeks "to preserve the status quo as of June 1, 2018" prior to when "Defendants executed their plan to destroy Aloha Toxicology's business." ECF No. 10-2 at 4.  The court agrees.  Accordingly, Defendants are hereby ordered to comply with the preliminary injunction as follows:

- By October 5, 2018, Ohana/NextGen must discontinue servicing all former Aloha Toxicology clients (who were clients of Aloha Toxicology as of June 1, 2018).[26]

- Defendants shall send a notification by September 20, 2018 to any former Aloha Toxicology client (who was a client of Aloha Toxicology as of June 1, 2018) that is now serviced by Ohana/NextGen. The notification shall state that Ohana/NextGen may continue servicing these clients only until October 5, 2018. A copy of this Order shall be included with the notification.

- Defendants shall send a copy of this Order by September 20, 2018 to any former Aloha Toxicology employee (who was employed by Aloha Toxicology as of June 1, 2018) who is now working at Ohana/NextGen.

- Defendants shall not utilize misappropriated trade secrets in any way, including to solicit any Aloha Toxicology client or employee (who was a client or employee of Aloha Toxicology as of June 1, 2018).

- Defendants shall discontinue and refrain from making any false statements about Aloha Toxicology, such as that Aloha Toxicology lost its certification, is shutting down, or was bought out by Ohana/NextGen.

///

///

///

///

///

---

[26] This "grace period" is provided so that clients do not have a gap of service. Again, to be clear, the clients are not required to return to Aloha Toxicology. Instead, they may conduct whatever due diligence is appropriate and associate with any appropriate laboratory.

# V.  CONCLUSION

For the foregoing reasons, the court GRANTS a preliminary

injunction, and the Motion is GRANTED with relief limited as described above.[27]

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, September 17, 2018.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*WHIC LLC v. NextGen Labs., Inc., et al.*, Civ No. 18-00261 JMS-RLP, Order Granting
Preliminary Injunction

---

[27]  Unless waived, Federal Rule of Civil Procedure 65(c) requires a movant to "give
security in an amount that the court considers proper" if a preliminary injunction or temporary
restraining order is issued.  Because this issue had not been raised or briefed by the parties
previously, the court held a September 14, 2018 status conference, and the parties consented to
have Magistrate Judge Richard Puglisi determine the amount of bond necessary to satisfy Rule
65(c).  As discussed at the September 14, 2018 status conference, the parties are to meet and
confer regarding a bond, and notify Judge Puglisi by September 21, 2018 whether they agree on
an amount.  If an agreement is not reached, simultaneously-filed memoranda limited to 10 pages
are due on that date.