CASE LOMBARDI & PETTIT
A LAW CORPORATION

MARK G. VALENCIA            6783-0
Email:  mgv@caselombardi.com
STEPHANIE M. SEGOVIA     10856-0
Email:  sms@caselombardi.com
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 2600
Honolulu, Hawaii  96813
Tel. No.: (808) 547-5400 | Fax No.:  (808) 523-1888

Attorneys for Plaintiff
**WIHC LLC dba ALOHA TOXICOLOGY**

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| WIHC LLC dba ALOHA TOXICOLOGY,<br><br>  Plaintiff,<br><br>vs.<br><br>NEXTGEN LABORATORIES, INC., OHANA GENETICS, INC., HEIDI MAKI, STEPHANIE SIMBULAN, and DOE DEFENDANTS 1 – 20,<br><br>  Defendants. | CIVIL NO. 1:18-cv-00261-JMS-RLP (18 U.S.C. §§ 1836 and 1962)<br><br>**PLAINTIFF WIHC LLC dba ALOHA TOXICOLOGY'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED VERIFIED COMPLAINT, FILED ON SEPTEMBER 26, 2018; DECLARATION OF DAN HLAVACHEK; EXHIBITS "A" – "C"; DECLARATION OF STEPHANIE M. SEGOVIA; EXHIBITS "D" - "E;" DECLARATION OF BRYAN LEFFLER; CERTIFICATE OF WORD COUNT; CERTIFICATE OF SERVICE** |

| | |
|---|---|
| WIHC LLC dba ALOHA TOXICOLOGY,<br><br>        Plaintiff,<br><br>  vs.<br><br>NEXTGEN LABORATORIES, INC., OHANA GENETICS, INC., HEIDI MAKI, STEPHANIE SIMBULAN, and DOE DEFENDANTS 1 – 20,<br><br>        Defendants. | CIVIL NO. 1:18-cv-00261-JMS-RLP (18 U.S.C. §§ 1836 and 1962)<br><br>Hearing<br>Date: December 3, 2018<br>Time: 9:00 a.m.<br>Judge: Honorable Michael J. Seabright |

# TABLE OF CONTENTS

**PAGE(S)**

I   INTRODUCTION ....................................................................................1

II.   BACKGROUND ...................................................................................3

III.   STANDARD OF REVIEW......................................................................4

    A.   Rule 12(b)(6):  Factual Allegations Must Be Deemed True............... 5

    B.   Summary Judgment:   All Facts, Evidence And Inferences Construed In Aloha Toxicology's Favor ............................................... 6

IV.   ARGUMENT.........................................................................................7

    A.   COUNT I AND COUNT III – DTSA and RICO ............................... 7
        i.   Purpose Of The DTSA............................................... 7
        ii.   The Internet Flows In Interstate Commerce. ............................ 9
        iii.   Examples of Activities Used in Commerce............................ 11
        iv.   The DTSA and the FAC. ........................................ 13

    B.   COUNT V – UNFAIR COMPETITION ......................................... 16
        i.   Gurrobat v. HTH Corp........................................... 16
        iii.   The Toxicology Market In Hawaii Is Both Narrow And Discrete. ..................................................... 20
        iii.   Toxicology Output Decreases................................. 22
        iv.   Harm To Consumers Is Harm To The Market....................... 24
        v.   Conclusion .................................................... 25

    C.   COUNT VI – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS................................................ 26

    D.   COUNT VII – CONVERSION....................................... 27

    E.   COUNT IX - SPOLIATION OF EVIDENCE................................... 28

    F.   COUNT VIII – UNJUST ENRICHMENT. ..................................... 31

V.   LEAVE TO AMEND FIRST AMENDED COMPLAINT..........................35

VI.   CONCLUSION..............................................................................................36

# TABLE OF AUTHORITIES

## Cases

Albert S. Smyth Co., Inc. v. Motes,
No. CV CCB-17-677, 2018 WL 3635024 (D. Md. July 31, 2018)...............12

Alexander v. City and County of Honolulu Police Dept.,
Civil No. 06-00595 JMS/KSC, 2007 WL 2915623, at *3
(D. Haw. Sept. 28, 2007) ..................................................................................6

Ashcroft v. Iqbal,
556 U.S. 662, 678, (2009) ............................................................................31

Balistreri v. Pacifica Police Dep't, 901 F.2d 696 (9th Cir. 1988), ...........................6

BlueEarth Biofuels, LLC v. Hawaiian Elec. Co., Inc.,
123 Hawai`i 314 (2010)......................................................................... 26, 27

Broussard v. Univ. of Cal. at Berkeley,
192 F.3d 1252, 1258 (9th Cir. 1999) ...........................................................7

Celotex Corp. v. Catrett,
477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed.2d 265 (1986) ........................7

Conley v. Gibson, 355 U.S. 41 (1957)........................................................................6

Davis v. Four Seasons Hotel Ltd., 122 Hawai`i 423, 228 P.3d 303 (2010) ..... 16, 20

Government Employees Insurance Co. v. Nealey,
262 F. Supp. 3d 153, 172 (E.D. Pa. 2017)...................................................11

Gurrobat v. HTH Corp., 133 Hawai`i 1 (2014) ............................. 16, 17, 19, 20, 24

Hannah v. Heeter, 584 S.E.2d 560 (2003).............................................................29

Hawaii Med. Ass'n v. Hawaii Med. Serv. Ass'n, Inc.,
113 Hawai`i 77, 148 P.3d 1179 (2006) ............................................ 17, 20, 24

Hawkins v. Fishbeck, 301 F. Supp.3d 650, (W.D. Va. 2017) .................................12

<u>Hicks v. PGA Tour, Inc.</u>, 897 F.3d 1109 (9th Cir. 2018) .........................................5

<u>Hoke v. United States</u>, 227 U.S. 308 (1913)...........................................................10

<u>Kaiser Found. Health Plan, Inc. v. Hawaii Life Flight Corp.</u>,
    No. CV 16-00073 ACK-KSC, 2017 WL 1534193,
    at *10 (D. Haw. Apr. 27, 2017)................................................... 20-22, 24, 25

<u>Kawakami v. Kahala Hotel Inv'rs, LLC</u>,
    142 Hawai`i 507, 421 P.3d 1277 (2018) ........................................................16

<u>Kim v. Potter</u>,
    474 F. Supp.2d 1175 (D. Haw. 2007)...............................................................7

<u>Lee v. City of L. A.</u>,
    250 F.3d 668 (9th Cir. 2001) ...........................................................................6

<u>Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n</u>,
    884 F.2d 504 (9th Cir. 1989) .........................................................................21

<u>Matsuura v. E.I. du Pont de Nemours & Co.</u>,
    102 Hawai`i 149, 73 P.3d 687 (2003) ...................................................... 28, 29

<u>Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.</u>,
    545 U.S. 967, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) ...............................10

<u>Polich v. Burlington N., Inc.</u>, 942 F.2d 1467 (9th Cir. 1991)..................................36

<u>Reno v. ACLU</u>, 521 U.S. 844 (1997) ...................................................................10

<u>Rizzuto v. Davidson Ladders, Inc.</u>, 905 A.2d 1165 (Conn. 2006) ..........................29

<u>Snead v. Metro. Prop. & Casualty Ins. Co.</u>, 237 F.3d 1080 (9th Cir. 2001) ............7

<u>Space Sys./Loral, LLC v. Orbital ATK, Inc.</u>,
    306 F. Supp.3d 845 (E.D. Va. 2018)..............................................................12

<u>Suture Exp., Inc. v. Cardinal Health 200, LLC</u>,
    963 F.Supp.2d 1212 (D. Kan. 2013) ..............................................................32

<u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>,

809 F.2d 626 (9th Cir. 1987) ...........................................................7

U.S. v. Am. Bldg. Maint. Indus., 422 U.S. 271 (1975) .............................7

United States v. Holder, 302 F.Supp. 296, 298 (D.Mont.1969) .............................10

United States v. Hornaday, 392 F.3d 1306 (11th Cir.2004)...................................11

United States v. Pirello, 255 F.3d 728 (9th Cir.2001) .............................................11

United States v. Sutcliffe, 505 F.3d 944 (9th Cir. 2007)........................................11

United States v. Trotter,  478 F.3d 918 (8th Cir.2007) ..........................................11

United States v. MacEwan, 445 F.3d 237 (3d Cir.2006)........................................11

## OTHER AUTHORITIES

H.R. Rep. No. 114-529  ..............................................................................8

H.R. Rep. No. 114-220.................................................................................. 9

42 C.F.R. § 493.1445.................................................................................15

## RULES

Fed. R. Civ. P. 12(d)  ..............................................................................4

Fed. R. Civ. P. 9(b) ..................................................................................29

Fed. R. Civ. P. 56(c)..................................................................................7

Fed. R. Civ. P. 65(a)(2)..............................................................................5

**PLAINTIFF WIHC LLC dba ALOHA TOXICOLOGY'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED VERIFIED COMPLAINT, FILED ON SEPTEMBER 26, 2018**

## I.   **INTRODUCTION**

Plaintiff WIHC LLC dba ALOHA TOXICOLOGY ("Aloha Toxicology"), by and through its counsel, Case Lombardi & Pettit, submits its Memorandum in Opposition to Defendants' Motion to Dismiss First Amended Complaint (the "FAC"), filed September 26, 2018 (the "Motion").

Because the Court has already considered matters outside of the pleadings, including numerous exhibits and witness testimony that are now part of the record, the Motion must be treated as one for summary judgment and all parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.  On this basis alone, the Motion should be denied.

The Motion should be denied for the following additional reasons:

A.    The allegations in the First Amended Complaint must be deemed true for purposes of a motion to dismiss under Federal Rule of Civil Procedure ("FRCP") 12(b)(6).

B.    The Court may look outside the pleadings for a motion to dismiss for lack of subject matter jurisdiction under FRCP 12(b)(1).

C.    There is substantial evidence that Aloha Toxicology's trade secrets are related to its toxicology services that are used in interstate commerce including

(i) its use of the internet, (ii) its use of vendors in other states, (iii) the sending of patient samples across state lines, and (iv) and the travel of its employees across state lines.

D.     The FAC adequately pleads unfair competition because Aloha Toxicology has shown Defendants' conduct is harmful to fair competition and Defendants used unlawful acts to incentivize customers to use Ohana and NextGen over competitors; furthermore, Hawaii is a narrow and discrete market, thus, Aloha Toxicology's burden is to show harm to Aloha Toxicology, harm to consumers, or output decreases from the Hawaii toxicology industry, and Plaintiff had shown this.

E.     Tortious interference is not preempted, because the judicially determined false statements made by Defendants to Aloha Toxicology's clients and employees resulting in the termination without notice of those contractual relationships are independent of the misappropriation of trade secrets.

F.     The conversion claim is not preempted because it rests on wrongful conduct other than the misappropriation of trade secrets.

G.     There is no proof of a heightened pleading standard for the tort of spoliation of evidence in the state of Hawaii, and even if there is a heightened standard the Court has evidence before it that Defendants have intentionally deleted potentially critical evidence to Aloha Toxicology's claims.

## II.   **BACKGROUND**

The Court is aware of the background facts of this case.   See Exhibit D (Order Granting Preliminary Injunction, filed September 17, 2018) ("Order") at 2-17 (discussing case background).   In short, Defendants NextGen Laboratories, Inc. ("NextGen"), Ohana Genetics, Inc. ("Ohana"), Heidi Maki ("Maki"), and Stephanie Simulan ("Simulan") (collectively "Defendants") engaged in a conspiracy to steal Aloha Toxicology's business.[1]   NextGen and Ohana—both Aloha Toxicology competitors—carried out this conspiracy by secretly hiring Maki and Simulan, keeping them in place as Aloha Toxicology employees, paying them full-time salaries, and using their knowledge and access to misappropriate client and employee information.   Maki, while secretly serving dual roles of Director of Sales for Aloha Toxicology and Vice President of Sales for NextGen/Ohana, spearheaded the takeover of Aloha Toxicology's business by intentionally misleading clients and employees, telling them that Aloha Toxicology was out of business and/or bought out by NextGen/Ohana.   This outrageous conduct nearly led to the destruction of Aloha Toxicology's business.

Importantly, the Court has already determined that Maki (a NextGen/Ohana officer) and Simulan (a NextGen/Ohana employee) are not credible witnesses. See Order at 20 ("And the court concludes that Maki and Simulan were not, on

the whole, credible witnesses.") at 21 ("It is clear that Maki lied about Aloha Toxicology in order to try to get Aloha Toxicology's clients to switch their business to Ohana/NextGen.") at 23 ("In short, although Maki and Simbulan both testified truthfully as to some matters, the court determines based on demeanor, manner of testimony, and credible testimony to the contrary, that Maki and Simbulan were not credible witnesses.").  The fact that Defendants are dishonest witnesses should, respectfully, weigh heavily in the Court's analysis of the Motion.

## III.   <u>STANDARD OF REVIEW</u>

Defendants' Motion falls within the parameters of Rule 12(d) of the Federal Rules of Civil Procedure, which requires conversion to a summary judgment motion if matters outside of the pleadings are considered:

> When ruling on a Rule 12(b)(6) motion, if "matters outside the pleadings are presented to and not excluded by the court, the motion **must be** treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."

<u>Hicks v. PGA Tour, Inc.</u>, 897 F.3d 1109, 1117 (9th Cir. 2018) (quoting Fed. R. Civ. P. 12(d)) (emphasis added).

Matters outside of the pleadings have unquestionably been presented to the considered by this Court, including numerous exhibits and witness testimony.  <u>See</u> Exhibit D (Order).  These matters are now part of the record.  <u>See</u> Fed. R. Civ. P.

---

[1] Maki is incorrectly identified in the Complaint and subsequent pleadings as

65(a)(2) ("evidence that is received on the motion [for preliminary injunction] and that would be admissible at trial becomes part of the trial record and need not be repeated at trial").

Accordingly, the Motion should be converted to a summary judgment motion.  The parties are engaged in discovery, which is likely to reveal evidence in support of Aloha Toxicology's claims.  <u>See</u> Exhibit E (Collectively First Request for Production of Documents to NextGen, Ohana, Maki, and Simbulan, dated October 18, 2018).  No claims should be dismissed at this stage of proceedings given the extensive record that has already been created, the false testimony given by Defendants at the evidentiary hearing, and the ongoing discovery between the parties.

### A.     <u>Rule 12(b)(6):  Factual Allegations Must Be Deemed True.</u>

If the Court does not convert the Motion, all factual allegations must be deemed true:

> Federal Rule of Civil Procedure 12(b)(6) permits a motion to dismiss a claim for "failure to state a claim upon which relief can be granted [.]" Fed. R. Civ. P. 12(b)(6).  When reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, a court takes the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff. <u>Lee v. City of L. A.</u>, 250 F.3d 668, 679 (9th Cir. 2001).  "Conclusory allegations of law, however, are insufficient to defeat a motion to dismiss."  <u>Id.</u> Under Rule 12(b)(6), a complaint should not be dismissed "'unless it appears beyond doubt that the plaintiff can

---

"Heidi."  The correct spelling of her first name is "Heide."

prove no set of facts in support of his claim which would entitle him to relief.' "Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Id.

Alexander v. City and County of Honolulu Police Dept., Civil No. 06-00595 JMS/KSC, 2007 WL 2915623, at *3 (D. Haw. Sept. 28, 2007).

**B.    Summary Judgment:    All Facts, Evidence And Inferences Construed In Aloha Toxicology's Favor.**

If the Court does convert the Motion to a summary judgment motion, Defendants have the burden of showing the absence of genuine issues of material fact and all facts, evidence, and inferences are construed in the Aloha Toxicology's favor:

> A party is entitled to summary judgment as to any claim where there is no genuine issue as to any material fact contained in the pleadings, depositions, answers to interrogatories, admissions or affidavits. Fed. R. Civ. P. 56(c).   "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed.2d 265 (1986).   When reviewing a motion for summary judgment, the court construes the evidence-and any dispute regarding the existence of facts-in favor of the party opposing the motion.   Snead v. Metro. Prop. & Casualty Ins. Co., 237 F.3d 1080, 1086 (9th Cir. 2001).   The moving party bears the initial burden of showing that there is no factual dispute regarding those claims for which summary judgment is sought.   See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n., 809 F.2d 626, 630 (9th Cir. 1987).   Nevertheless, "summary judgment is mandated if the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'"

Broussard v. Univ. of Cal. at Berkeley, 192 F.3d 1252, 1258 (9th Cir. 1999) (quoting Celotex, 477 U.S. at 322, 106 S. Ct. at 2548)

Kim v. Potter, 474 F. Supp.2d 1175, 1184-85 (D. Haw. 2007).

## IV.  ARGUMENT

### A.  COUNT I AND COUNT III – DTSA and RICO

#### i. Purpose Of The DTSA.

The Motion to dismiss should be denied because Plaintiff had sufficiently plead interstate commerce in the FAC, and Defendants cite a number of cases that are outdated considering interstate commerce is an issue highly associated with keeping up with the advancement of technology.

Defendants rely heavily on the 1975 case, U.S. v. Am. Bldg. Maint. Indus., 422 U.S. 271 (1975), for the proposition that the term "use in," when incorporated into a jurisdiction element, requires that the products or services be in "the flow of interstate commerce," Id. at 276. The Am. Bldg. Maint. Court was actually analyzing the phrase "no corporation **engaged in** commerce," to confirm Congress's intent that the only entities "engaged in commerce" could fall under section 7 of the Clayton Act, which prevents anticipative practices from creating unlawful monopolies. See id.

In contrast to Am. Bldg. Maint., where Congress was defining the parameters of the Clayton Act's governmental reach, the Defend Trade Secrets Act ("DTSA") was designed to provide an additional forum for trade secret owners as

the DTSA does not preempt state law.  See H.R. Rep. No. 114-529, at 6.  Congress

recognized the need to protect companies like Aloha Toxicology from thieves such

as Defendants:

> The trade secrets of American companies are increasingly at risk for misappropriation by thieves looking for a **quick payday or to replicate** the market-leading innovations developed by trade secret owners. Using ever-more sophisticated means of attack, these thieves aim to steal the know-how that has made American industry the envy of the world. The Commission on the Theft of American Intellectual Property found that the illegal theft of intellectual property is undermining the means and incentive for entrepreneurs to innovate, slowing the development of new inventions and industries that could raise the prosperity and quality of life for everyone. **The threat is significant: Trade secrets are an integral part of a company's competitive advantage in today's economy**…[T]he Center for Responsible Enterprise and Trade, along with PwC, issued a report estimating that **trade secret theft exacts a cost on U.S. companies of between one and 3 percent of GDP annually, roughly a cost of between $160 and $480 million each year**…[T]rade secret theft today is often not confined to a single state. The **theft increasingly involves the movement of secrets across state lines**, making it difficult for state courts to efficiently order discovery and service of process.

H.R. Rep. No. 114-529, at 3-4 (emphasis added).

All Defendants in the instant action engaged in the unlawful

misappropriation of Aloha Toxicology's trade secrets as a "quick pay-day," rather

than taking the entrepreneurial route and developing their toxicology business as

Aloha Toxicology did – with market research and substantial resources over time.

Furthermore, Defendants' unlawful actions resulted in the loss of Aloha

Toxicology employee jobs including, but not limited to, Ronald Li and Andrelle

Okamura.  <u>See</u> Testimony of Ronald Li, Transcript of Proceedings on September 11, 2018, at p. 26:11 [ECF No. 50] Trade secret theft has led to the loss of 2.1 million American jobs each year.  <u>See</u> H.R. Rep. No. 114-220, at 2. "A Federal cause of action will allow trade secret owners to protect their innovations by seeking redress in Federal court, bringing their rights into alignment with those long enjoyed by owners of other forms of intellectual property, including copyrights, patents, and trademarks." H.R. Rep. No. 114-220, at 3.

For the reasons stated above, the interstate commerce element of the Clayton Act should not be construed as a helpful analytical tool for the analysis of the commerce element in the DSTA. There is certainly a difference between providing forum access for the protection of trade secrets compared with Congress's responsibility of ensuring that the serious penalties of the Clayton Act are only imposed on unlawful monopolies engaged in commerce.

With that said, the FAC demonstrates that Aloha Toxicology's services flow in interstate commerce.

### ii.  The Internet Flows In Interstate Commerce.

Defendants cite <u>Hoke v. United States</u>, 227 U.S. 308, 320 (1913): "Commerce among the states, we have said, consists of intercourse and traffic between their citizens, and includes the transportation of persons and property."

Technological advances make this citation obsolete under the current state of the world.

Defendants fail, however, to account for the voluminous case law supporting the proposition that making use of the Internet engages a business in interstate commerce, including the Ninth Circuit:

> "**The Internet is an international network of interconnected computers**," Reno v. ACLU, 521 U.S. 844, 849, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), similar to-and often using-our national network of telephone lines, see Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). We have previously agreed that **"[i]t cannot be questioned that the nation's vast network of telephone lines constitutes interstate commerce**," United States v. Holder, 302 F.Supp. 296, 298 (D.Mont.1969), aff'd and adopted, 427 F.2d 715 (9th Cir.1970) (per curiam), and, a fortiori, it seems clear that **use of the internet is intimately related to interstate commerce**. As we have noted, "**[t]he Internet engenders a medium of communication that enables information to be quickly, conveniently, and inexpensively disseminated to hundreds of millions of individuals worldwide**." United States v. Pirello, 255 F.3d 728, 729 (9th Cir.2001). It is "comparable ... to both a vast library including millions of readily available and indexed publications and a sprawling mall offering goods and services," ACLU, 521 U.S. at 853, 117 S.Ct. 2329, and is "a valuable tool in today's commerce," Pirello, 255 F.3d at 730. We are therefore in agreement with the Eighth Circuit's conclusion that "[a]s both the means to engage in commerce and the method by which transactions occur, '**the Internet is an instrumentality and channel of interstate commerce**.' " United States v. Trotter, 478 F.3d 918, 921 (8th Cir.2007) (per curiam) (quoting United States v. MacEwan, 445 F.3d 237, 245 (3d Cir.2006)); see also United States v. Hornaday, 392 F.3d 1306, 1311 (11th Cir.2004) ("**Congress clearly has the power to regulate the internet, as it does other instrumentalities and channels of interstate commerce**....").

United States v. Sutcliffe, 505 F.3d 944, 952-53 (9th Cir. 2007) (emphasis added).

The FAC provides ample information for how the Internet plays a significant role in Aloha Toxicology's business (discussed below).

Defendants also cite Government Employees Insurance Co. v. Nealey, 262 F. Supp. 3d 153 (E.D. Pa. 2017) asserting that the Nealey court dismissed the "DTSA claim because the complaint failed to allege any nexus between interstate or foreign commerce and the alleged trade secrets." Id. at 172. However, the Nealey court dismissed the DTSA claim on multiple grounds including a failure to plead reasonable steps to protect a trade secret.  See id. at 170. In fact, of the three trade secret cases cited in the Motion, Defendants do not cite a single case where a DTSA claim was dismissed on a failure to plead interstate commerce grounds alone. See Yager v. Vignieri, No. 16CV9367 (DLC), 2017 WL 4574487 (S.D.N.Y. Oct. 12, 2017) (denying motion to dismiss); see also Albert S. Smyth Co., Inc. v. Motes, No. CV CCB-17-677, 2018 WL 3635024 (D. Md. July 31, 2018) (denying motion to dismiss).

### iii.   Examples of Activities Used in Commerce.

Defendants' assertion that Aloha Toxicology must plead customers crossing state lines in order to demonstrate commerce is misplaced. In Yager, it is true that the court denies a motion to dismiss because customers cross states lines, Yager

2017 WL 4574487, at *2, but this is only one example of many that a plaintiff can plead in a complaint.

Albert only mentions out-of-state customers in a footnote where the court states: "At the motion to dismiss stage, **it is sufficient that Smyth alleges that it does business over the internet**. The court may easily infer that an online jewelry business attracts out-of-state customers to Smyth's products." Albert S. Smyth Co., Inc., 2018 WL 3635024, at *3 (emphasis added). Therefore, Albert stands for the proposition that (1) out-of-state customers are one way of demonstrating interstate commerce, and (2) that a business's use of the internet is sufficient to survive a motion to dismiss.

Vendor relationships that cross state lines are another example of how to show a product or service is related in interstate commerce. See Space Sys./Loral, LLC v. Orbital ATK, Inc., 306 F.Supp.3d 845, 854 (E.D. Va. 2018) (asserting, "Here, the purported information relates to services used and intended for use in interstate and foreign commerce because it contains business plans, procurement strategies and subcontractor and **vendor relationships**.") (emphasis added); see also Hawkins v. Fishbeck, 301 F. Supp.3d 650, 658 (W.D. Va. 2017) (finding ". . . the amended complaint elsewhere satisfies this element by discussing commerce **with other developers** and tests with potential customers.") (emphasis added).

### iv.  The DTSA and the FAC.

Under the DSTA "An owner of a trade secret that is misappropriated may bring a civil action under [the DTSA] if the trade secret is **related** to a product or **service used in**, **or intended for use in**, interstate or foreign commerce." 18 U.S.C.A. § 1836. In the instant action, the trade secrets in question are (1) client and employee information, and (2) the operating procedures of Aloha Toxicology's laboratory (the "Trade Secrets"). The Trade Secrets are related to toxicology drug testing, as this is the "service" that Aloha Toxicology provides to customers. The service of testing toxicology requires: (a) use of the internet, (b) the use of vendors in other states, (c) the sending of patient samples across state lines, and (d) and the travel of employees across state lines.

(a) The FAC describes how toxicology services require the use of the Internet to stay connected with owners, laboratory personnel, vendors, and customers:

> 13.    Aloha Toxicology employs a Laboratory Director to oversee the operations of the laboratory.  At all relevant times, the Laboratory Director lived in New Haven, Connecticut and carried out his oversight responsibilities through the internet including email communication, phone calls, and text messages.

> 15.    Aloha Toxicology employees use computers and the internet to communicate with each other.

> 16.    Aloha Toxicology's customers communicate with Aloha Toxicology through the internet, including emails and phone calls, regarding Aloha Toxicology's toxicology services.

> 73.    At all relevant times, Aloha Toxicology's service included drug testing.   This service involved interstate commerce by, among other things, communication and oversight through the internet, email, and phone calls by Aloha Toxicology's owners, Laboratory Director, employees, and Clients.   The ordinary course of this service includes sending patient samples across state lines.

(b) & (c) Toxicology service providers in Hawaii generally require vendor contracts in other states as the drug testing industry in Hawaii is limited. See Testimony of Dan Hlavachek, Transcript of Proceedings on August 22, 2018, at p. 26:11-26:15 [ECF No. 45]; see also Declaration of Dan Hlavachek ("Hlavachek Declaration") ¶ 4. The FAC shows Aloha Toxicology's use of vendors in other states and that patient samples are sent across states lines.

> 14.    It is the ordinary practice of Aloha Toxicology to send patient samples across state lines to its reference laboratory in Seattle, Washington.

Aloha Toxicology's consistent use of vendor, Cordant Health Solutions ("Cordant"), is also exemplary of Aloha Toxicology's services "used in" interstate commerce.  (Copies of the Cordant Agreements are attached as Exhibit A.) It is not uncommon for toxicology labs to offer services to clients that can only be provided through the use of another lab. For example, Aloha Toxicology does not test saliva; only urine. Therefore, if a client needs a saliva sample tested, Aloha Toxicology

accepts the sample from the client and sends the sample across state lines to Cordant.  See Hlavachek Declaration ¶ 3.

Furthermore, mailing patient samples is highly common as nearly all of Aloha Toxicology's competitors are located on the mainland and send patient samples across states lines.  See Declaration of Bryan Leffler "Leffler Declaration" ¶ 8. Notably, Maki and Simbulan sent patient samples across state lines when they attempted to shut down Plaintiff's business.  See Testimony of Dr. Joe El-Khoury, Transcript of Proceedings on August 22, 2018, at p. 135:15 [ECF No. 42].

(d) The FAC demonstrates that toxicology services commonly involve employees crossing state lines.

> 12.    At all relevant times, two of the member-owners of Aloha Toxicology lived in New Hampshire and Massachusetts and communicated with the employees of Aloha Toxicology through the internet including emails and phone calls.

> 13.    [See above].

Toxicology laboratories require consulting with lab directors who often do not live in the same state as lab directors can oversee up to five (5) different labs throughout the country.  See 42 C.F.R. § 493.1445. For example, Dr. El-Khoury is a professor at Yale University, but oversees laboratories throughout the country.

Defendants ignore the above-stated facts when they argue that Aloha Toxicology's services are only intrastate. Defendants' assertion that because Plaintiff states it is "premier service provider of toxicology in the state of Hawaii,"

FAC ¶ 17, Plaintiff is admitting its services are contained within Hawaii is futile. As an analogy: Bank of Hawaii may be the premier bank in the state of Hawaii, but that statement, alone, does not show that Bank of Hawaii only engages is intrastate activity.

Because there is ample evidence of Aloha Toxicology's services being used in interstate commerce, the Motion should be denied.

### B.   COUNT V – UNFAIR COMPETITION

#### i.   Gurrobat v. HTH Corp.

To what degree a plaintiff must allege harm to competition in a complaint under Hawaii Revised Statutes ("HRS") § 480-2 is an evolving issue in the State of Hawaii. However, recently the Hawaii Supreme Court confirmed that it considers Chapter 480 a "remedial statute" that "must be construed liberally." Kawakami v. Kahala Hotel Inv'rs, LLC, 142 Hawai`i 507, 520, 421 P.3d 1277, 1290 (2018) (citing Davis v. Four Seasons Hotel Ltd., 122 Hawai`i 423, 429, 228 P.3d 303, 310 (2010)).

Defendants incorrectly argue that Plaintiff has misread Gurrobat v. HTH Corp., 133 Hawai`i 1, 323 P.3d 792 (2014), as the Hawaii Supreme Court statements were clear:

> [P]roof of how a defendant's conduct negatively affected competition does not necessarily require expert testimony, proof that a defendant lowered their prices, or that a defendant's conduct injured other hotels. **A plaintiff is only required to prove that a defendant's conduct is**

**harmful to fair competition**…. [P]laintiffs may prove how a defendant's conduct negatively affects competition by showing that defendant's conduct enables the defendant to **create incentives for customers to purchase banquet services from the defendant instead of competitors who did not engage in the unlawful conduct**.

Gurrobat, 133 Hawai`i at 22, 323 P.3d at 813 (2014) (emphasis added).

In the Motion, Defendants explain that Gurrobat produced declarations from two experts opining that the law compliant hotels were at a competitive disadvantage. See Motion at 15. But Gurrobat did not concern a motion to dismiss and, therefore, Gurrobat's evidence was being measured at a different stage of litigation than the parties find themselves in the instant 12(b)1 and 12(b)(6) Motion.

Citing Hawaii Med. Ass'n v. Hawaii Med. Serv. Ass'n, Inc., 113 Hawai`i 77, 112-13, 148 P.3d 1179, 1214-15 (2006), the Gurrobat court stated:

> If HMSA engages in acts or practices that impede or interfere with [plaintiffs'] ability to provide effective healthcare services to their patients and/or create incentives for patients to look elsewhere for medical services—that is, to other participating physicians who may be reluctant to challenge HMSA or to non-participating physicians— such acts or practices can, if proven, constitute unfair methods of competition.

Gurrobat, 133 Hawai`i at 22, 323 P.3d at 813 (citing Hawaii Med. Ass'n, 113 Hawai`i at 112-113, 148 P.3d at 1214-15 (2006).

In the instant action, Defendants used unlawful deceptive and unfair acts to create incentives for clients to use Defendants' services over their

competitors by using Aloha Toxicology's industry know-how and established business relationships to attract clients who thought they had nowhere to go as Aloha Toxicology was allegedly shutting down. What was unknown to the clients was that the shutdown of Aloha Toxicology's business was entirely due to Defendants' deceitful plan to dismember Aloha Toxicology:

> 20.     Aloha Toxicology has engaged in extensive marketing and research efforts to develop its business and client base ("Clients").

> 23.     Aloha Toxicology's compilations of information (including Client lists), as well as its methods of operations (including cost and pricing information and marketing strategies) and processes (collectively "Trade Secrets") **gives it an opportunity to obtain an advantage over competitors who do not know or use it.**  The Trade Secrets derive independent economic value, actual and/or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use.  The Trade Secrets have been developed only through Aloha Toxicology's experience and substantial efforts.

> 38.     At various times in 2018, Maki and Simbulan were setting up a new lab with NextGen and/or Ohana Genetics and were spending as little as one day a week working at Aloha Toxicology.  Maki and Simbulan represented to Aloha Toxicology employees that they were working on a research project at a "partner lab."

> 45.     Maki used the failure to pass CAP samples as a pretext to unilaterally terminate Aloha Toxicology's employees.

58.    Upon information and belief, all or a substantial number of Aloha Toxicology Clients moved their business to NextGen and/or Ohana Genetics in approximately June 2018.

59.    Upon information and belief, all or a substantial amount of NextGen and/or Ohana Genetics' revenue derives from Aloha Toxicology Clients.

60.    NextGen and Ohana Genetics knew or should have known that all or a substantial number of their Hawaii clients were Aloha Toxicology Clients.

If the above actions are taken as true, as they must, these facts establish that Defendants' unfair and deceptive acts allowed Defendants to create incentives and lure Plaintiff's clients away from Aloha Toxicology to NextGen and Ohana. Defendants' unlawful and deceitful acquisition of Aloha Toxicology's institutional client knowledge was used to steal Plaintiff's clients. To execute their plan with precision, Defendants made sure to extinguish Plaintiff's business entirely so that clients truly only had one option: to follow Maki and Simbulan to Ohana and NextGen. See Testimony of former Aloha Toxicology client, Dwayne Kojima, Transcript of Proceedings on September 11, 2018, at p. 7:1, 7:21 [ECF No. 50], ("[Maki] had mentioned if she could send me some information about NextGen to possibly have NextGen do our confirmation testing…On the phone [Maki] had mentioned that the lab had lost its certifications, and rather than remedy the situation, they were just going to shut down the lab.").

The Gurrobat court concluded with:

Defendants' unlawful conduct, therefore, enables Defendants to obtain the business of customers through an **unfair and illegal business advantage over law-compliant hotels**, restaurants and banquet service providers. Therefore, **Gurrobat sufficiently proved that Defendants' conduct negatively affects fair competition**.

Gurrobat, 133 Hawai`i at 22, 323 P.3d at 813 (emphasis added).

### ii.    The Toxicology Market In Hawaii Is Both Narrow And Discrete.

As shown above, Aloha Toxicology has shown harm to competition under Gurrobat. However, the Court should follow the analytical strategy of Kaiser Found. Health Plan, Inc. v. Hawaii Life Flight Corp., No. CV 16-00073 ACK-KSC, 2017 WL 1534193, at *10 (D. Haw. Apr. 27, 2017), where circumstances of a narrow and discrete market enable a plaintiff to show harm to competition by showing harm to plaintiff's own business. In other words, because the Hawaii toxicology industry is narrow and discrete, showing harm to Aloha Toxicology is sufficient to demonstrate harm to fair competition.

While the Court has provided examples of factual allegations that constitute a sufficient pleading of "the nature of competition,"[2] the examples provided in the

---

[2] This court held that HMA sufficiently alleged the "nature of the competition" by, **for example**, alleging in its complaint that:

> 11. ... [HMSA's] conduct has adversely impacted, and continues to adversely impact, members of [HMSA's] plans by, among other things: (a) imposing financial hardships on, and in some cases threatening the continued viability of, the medical practices run by [the plaintiffs]; (b) threatening the continuity of care provided to patients by [the plaintiffs], as required by sound medical judgment; (c) requiring [the plaintiffs] to expend considerable resources seeking reimbursement that could otherwise be available to provide enhanced healthcare services to [HMSA's] plan members; (d) making it more costly and difficult for [the plaintiffs] to maintain and enhance the availability and quality of care that all patients receive; and (e) increasing the costs of rendering healthcare services in Hawaii as a result of the additional costs incurred

few Hawaii Supreme Court cases discussing this issue do not amount to an exhaustive list as the Hawaii State Legislature has chosen not to define the word "injury" under HRS, Chapter 480. An analysis of the facts and circumstances of this particular case is required under HRS Chapter 480.

While removal of one or a few competitors need not equate with injury to competition, see Kaiser, 2017 WL 1534193, at *10, the Kaiser court used the Ninth Circuit's exception to the requirement of providing market analysis to show harm to competition separate and distinct from Plaintiff's own injuries: "**Of course, convergence of injury to a market competitor and injury to competition is possible when the relevant market is both narrow and discrete and the market participants are few**." Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n, 884 F.2d 504, 508–09 (9th Cir. 1989).   In Les Shockley, the court found injury to fair competition where the exclusion of a single anesthetist reduced the number of competing anesthesia providers from **five to four**. See id. at 509.

Similarly, Aloha Toxicology has five competitors who provide toxicology services in the state of Hawaii. See Leffler Declaration ¶ 8. However, for those clients desiring to keep their business within Hawaii, the market is even smaller as Aloha Toxicology only has one Hawaii-based competitor:  S&G Labs of Kona, Hawaii. See Leffler Declaration ¶ 10. Moreover, for those clients wishing to keep

---

and considerable effort expended by HMA members in seeking reimbursement from HMSA for services

their business on the Island of Oahu, their options were completely wiped out by Defendants as Aloha Toxicology is the only provider on Oahu.   See Leffler Declaration ¶ 11. Like the plaintiff in <u>Les Shockingly</u>, the toxicology market in Hawaii is narrow and discrete.

While the plaintiff in <u>Kaiser</u> was successful in demonstrating that the market was narrow, the court stated that the plaintiff also needed to show that the defendant's conduct caused output decreases or harm to consumers. <u>Kaiser</u>, 2017 WL 1534193, at *10.

### iii.  Toxicology Output Decreases.

While injury to fair competition *may* include proof of the relevant geographic markets and demonstration of the restraint's anticompetitive effects within those markets, Defendants incorrectly assert that such an injury "must" be included in Aloha Toxicology's complaint.   See Motion at 11. The complete sentence that Defendants' cite from <u>Kaiser</u> on page 11, ¶ 4 of the Motion is as follows:

> Under the analogous Sherman Act, the Ninth Circuit has clearly stated that **ordinarily**, the factual support needed to show injury to competition must include proof of the relevant geographic markets and demonstration of the restraint's anticompetitive effects within those markets.... Avoiding such market analysis requires proof of actual **detrimental competitive effects** **such as output decreases** or price increases.

---

rendered...<u>Davis v. Four Seasons Hotel Ltd.</u>, 122 Hawai`i 423, 436, 228 P.3d 303, 316 (2010)

Kaiser, 2017 WL 1534193, at *10 (citing Les Shockley, 884 F.2d at 508, 509 (internal citations and quotation marks omitted) (emphasis added).

Plaintiff has shown output decreases in the FAC:

> 45.   Maki used the failure to pass CAP samples as a pretext to unilaterally terminate Aloha Toxicology's employees.

> 47.   During her June 18, 2018 meeting with Aloha Toxicology employees, Maki stated to them that the company could be shut down by CAP for up to six months while further investigation was done to rectify the problem with testing methods.  She stated that the Aloha Toxicology owners did not want to continue business, because it would be too much of a hassle and work for the employees to rectify testing methods.

> 57.   Maki's termination of Aloha Toxicology employees under false pretenses resulted in the lab being temporarily shut down. [Aloha Toxicology was shut down for four months]

> 113.   Maki misled Aloha Toxicology employees and Clients regarding the closure of the lab and the purported intent of the investors to shut down the business.

FAC ¶¶ 45, 47, 57, 113.

If the preceding facts are deemed true, as they must be, the FAC shows that the output of the toxicology industry in Hawaii dramatically decreased by Defendants' unfair and deceptive acts.  Aloha Toxicology, as "the premier service provider of toxicology services in the state of Hawaii," (FAC ¶ 17), was completely dismembered and shut down by the actions of Defendants. Of the two Hawaii-based toxicology testing providers, one was eliminated by Defendants' conduct causing a 50% decrease in Hawaii-based toxicology providers overnight.

Consumers were essentially forced to send their samples to S&G, or across the Pacific Ocean to the mainland.

### iv.  Harm To Consumers Is Harm To The Market.

"Hawaii courts have indicated that one way to show harm to the market is by showing how consumers have been affected by the complained-of conduct." Kaiser, 2017 WL 1534193, at *13 (citing Gurrobat, 133 Hawai`i 1, 30, 323 P.3d 792, 821 (interpreting the critical fact in HMA to be allegations "that the defendants' actions would harm patients, i.e. the "consumers" of healthcare.")); see also, Kaiser, 2017 WL 1534193, at *10 (granting motion to dismiss because, among other things, plaintiff "has not provided sufficient factual allegations supporting how the injuries it has suffered are anticompetitive **or how consumers have been harmed**.") (emphasis added).

It is detrimental to customers to waste resources and cause delays such as when Hina Mauka, one of the largest producers of toxicology samples to be tested, had its samples destroyed when Defendants unlawfully shut down Aloha Toxicology. See Heide Maki, Transcript of Proceedings on September 11, 2018, at p. 30:24 [ECF No. 50];

The testimony of former client, Dwayne Kojima of the Department of Public Safety, is illustrative of the harm consumers caused by Defendants' conduct:

Q      And at that time, we're still in June of 2018, what as the Department of Public Safety's intent regarding doing business with Aloha Toxicology for confirmation testing?

A      Our intent at that time was to continue business with Aloha Toxicology.

Q      Has that Changed?

A      Yes. At this time we are now seeking another vendor to provide the confirmatory testing for the department.

Q      Why?

A      **Because of the delay. This situation has caused a break in the services provided, and we have an obligation to offer second opinion testing to the inmates who test positive within our facilities. And currently we nobody to fulfil that and we're seeking to remedy that right now**.

Testimony of Dwayne Kojima, Transcript of Proceedings on September 11, 2018, at p. 8:21-9:9 [ECF No. 50] (emphasis added).

### v.  Conclusion

Under <u>Gurrabot</u>, Defendants' Motion should be denied because Aloha Toxicology have shown that Defendants unlawful conduct is harmful to fair competition as Defendants have used their unlawful acts to create incentives for consumers to choose Defendants' services of competitors. The Motion should be further denied under <u>Les Shockley</u>, and in line with the <u>Kaiser</u> analysis because the toxicology market in Hawaii is both narrow and discrete and, therefore, harm to Plaintiff overlaps with harm to fair competition. Since the toxicology industry in Hawaii is narrow and discrete, Aloha Toxicology's demonstration of harm to plaintiff, harm to consumers and a decrease in output from the toxicology industry is sufficient to show harm to competition under a HRS, Chapter 480-2(e) claim.

## C.   **COUNT VI – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS.**

To the extent that a claim is "based upon wrongful conduct, independent of the misappropriation of trade secrets," it will not be preempted by the HUTSA. BlueEarth Biofuels, LLC v. Hawaiian Elec. Co., Inc., 123 Hawai`i 314, 322, 235 P.3d 310, 318 (2010).   In this case, Aloha Toxicology need not prove that Defendants misappropriated trade secrets to prove tortious interference with contractual relations.

Aloha Toxicology unquestionably had contractual relationships with all of their clients and employees.  Not every contract was (or had to be) in writing.  But some of the contracts were in writing.   See Exhibit B (Customized Account Requests).

The Court has already determined that Maki (who as a NextGen/Ohana employee/officer) lied to Aloha Toxicology's customers and employees in an attempt to convince them to sever these contracts with Aloha Toxicology:

> **It is clear that Maki lied about Aloha Toxicology in order to try to get Aloha Toxicology's clients to switch their business to Ohana/NextGen**.   For example, Maki spoke with Aloha Toxicology client Kojima, who is the Substance Abuse Program Manager at DPS, on June 24, 2018. Kojima credibly testified that in seeking DPS business for Ohana/NextGen, Maki told him that Aloha Toxicology could not conduct confirmation testing for DPS because the laboratory had lost its certification, all the employees were leaving to go to another company, and the owners were going to shut down Aloha Toxicology.  While testifying, Maki falsely denied making these statements.  Dr. El-Khoury credibly explained

that during a June 18, 2018 phone conversation, Maki stated that the owners wanted to shut down the laboratory's operation. Again, in her testimony, Maki denied making this statement.

. . .

Maki told a different lie to Aloha Toxicology client Ma-e of Ohana Counseling Services (unrelated to Ohana/NextGen) as to why Aloha Toxicology was shutting down its operation. In a June 22, 2018 email, Maki told Ma-e that "Aloha Tox got purchased by another company and our name is changing to Ohana Laboratory's [sic]." Pl.'s Ex. 44 at AT000169.

Exhibit D (Order) at 21 and 21 n.22.

The preceding lies caused Aloha Toxicology clients and employees to abruptly and without notice terminate their relationships with Aloha Toxicology, causing the temporary shutdown of the business. These lies do not, standing alone, constitute misappropriation of trade secrets. Consequently, Defendants' preemption argument should be rejected.

## D.   <u>COUNT VII – CONVERSION</u>

The Motion should be denied because Count VII is not preempted by the HUTSA. Defendants' own argument is illustrative: "[A]s to the third element [of the tort of conversion], Plaintiff alleges, in relevant part, "Maki has engaged in illegal or abuse of the equipment by, **<u>among other things</u>**, misappropriating Trade Secrets…" Motion at 20 (emphasis added). The Hawaii Supreme Court has stated that to the extent that a claim is "based upon wrongful conduct, independent of the misappropriation of trade secrets," it will not be preempted by the HUTSA.

BlueEarth Biofuels, LLC v. Hawaiian Elec. Co., Inc., 123 Hawai`i 314, 322, 235 P.3d 310, 318 (2010).

In April 2018 Maki and Simbulan purchased with an Aloha Toxicology credit card certain office equipment including computers. See Exhibit C (Best Buy Receipt). This equipment was never returned to Aloha Toxicology. Hlavachek Declaration ¶ 7.

The FAC states:

55.   Maki's June 26, 2018 resignation fails to mention the laptop, computers, printers, mouse, cases, and hotspots purchased in April 2018 using Aloha Toxicology funds.  As of the date this Complaint was filed, that equipment has not been returned to Aloha Toxicology.

Maki and Simbulan's unlawful purchase and retention of this equipment after their departure from Aloha Toxicology constitutes unlawful acts entirely independent of the misappropriation of Aloha Toxicology's trade secrets.

For the foregoing reason, Count II is not preempted by the HUTSA.

### E.   COUNT IX - SPOLIATION OF EVIDENCE

Defendant's Motion as to the Spoliation claim focuses solely on Plaintiff's alleged failure to meet the heightened pleading requirements of FRCP 9(b).  This argument should be rejected for at least two reasons.

First, the Hawaii Supreme Court has not adopted the tort of spoliation of evidence. Therefore, Hawaii has not recognized the heightened pleading standard in state or federal court. Furthermore, Matsuura v. E.I. du Pont de Nemours & Co.,

102 Hawai`i 149, 73 P.3d 687 (2003), the leading case in Hawaii discussing the potential adoption of spoliation, does not mentioned heightened pleading. Neither did the Connecticut Supreme Court when it adopted spoliation of evidence as a stand-alone tort. See Rizzuto v. Davidson Ladders, Inc., 905 A.2d 1165 (Conn. 2006). Nor did the Supreme Court of Appeals of West Virginia think it necessary to discuss a heightened pleading standard when it adopted the tort. See Hannah v. Heeter, 584 S.E.2d 560 (2003).

Second, Matsuura discusses both intentional and negligent spoliation of evidence and negligent spoliation does not require heightened pleading. See Matsuura, 73 P.3d 687, 704 (2003), opinion after certified question answered, 330 F.Supp.2d 1101 (D. Haw. 2004), rev'd and remanded sub nom., Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353 (9th Cir. 2005). Negligent spoliation does, however, require a showing of an affirmative duty:

> It is generally agreed that recognizing a tort of negligent spoliation against a third party is problematic absent some type of affirmative duty to preserve the evidence. Under our tort law, in order to establish a prima facie case of negligence in West Virginia, it must be shown that the defendant has been guilty of some act or omission in violation of a duty owed to the plaintiff. No action for negligence will lie without a duty broken.

Hannah, 584 S.E.2d at 568 (2003) (quotation marks omitted).

The FAC states:

145.   Defendants had and have a duty to preserve all evidence that is relevant to the Complaint.

146.   Upon information and belief, one or more Defendants may have destroyed potential evidence relevant to the Complaint.

147.   Upon information and belief, one or more Defendants may have intentionally destroyed evidence relevant to the Complaint.

148.   The destruction of evidence relevant to the Complaint may interfere with Aloha Toxicology's ability to prove one or more claims in this lawsuit.

149.   If Aloha Toxicology is unable to prove one or more claims in this lawsuit as a result of Defendants' destruction of evidence, Aloha Toxicology could be damaged in an amount to be proved at trial or hearing, but likely in excess of $5 million.

The United States Supreme Court has cautioned that in a motion to dismiss "[t]he plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678, (2009) (internal quotation marks omitted). If the foregoing facts are taken as true, as they must, together they demonstrate the plausibility that some or all of the defendants intentionally and/or negligently destroyed evidence relevant to this action that could ultimately be the reason Aloha Toxicology may not be able to prove one of its claims.

The Court has before it evidence that Defendants have acted unlawfully as to spoliation. At some point during June and/or July 2018, Defendant Maki, acting on

behalf of NextGen and Ohana since March of 2018, told Simbulan to delete Simbulan's e-mails. See Testimony of Dr. Joe El-Khoury, Transcript of Proceedings on August 22, 2018, at p. 151:25-152:13 [ECF No. 42]. Thus, it not only plausible, but likely that Defendants engaged in the spoliation of critical evidence in the instant action Therefore, the Motion should not be granted on a technicality as there is already evidence that Plaintiffs claim is viable.

### F.   COUNT VIII – UNJUST ENRICHMENT.

Defendants move the Court to dismiss Aloha Toxicology's unjust enrichment claim as to NextGen and Ohana only. Defendants erroneously argue that Aloha Toxicology has not conferred a benefit upon Ohana and NextGen.

Defendants cite Suture Exp., Inc. v. Cardinal Health 200, LLC, 963 F.Supp.2d 1212 (D. Kan. 2013) for the proposition that a plaintiff must allege an action by plaintiff that benefited defendant, and not that defendant's own actions benefited defendant. While Aloha Toxicology agrees with this proposition, Suture has no applicability to the facts of the instant action.

Suture concerned a plaintiff-company bringing antitrust claims as well as an unjust enrichment claim against certain defendants entering the same suture and endo product market as the plaintiff-company. The plaintiff-company failed to allege an action by the plaintiff-company that benefited the defendants. See Suture, 963 F. Supp.2d at 1230. In essence, the defendants' own actions (i.e.

entering the suture and endo market in the manner they did) benefited defendants. The court granted defendants' motion to dismiss.

The instant action is nothing like the tenuous relationship between the plaintiff and defendant in <u>Suture</u>. Here, Ohana and NextGen entered the Hawaii toxicology market by infiltrating Aloha Toxicology's business and stealing its employees and customers. In doing so, Aloha Toxicology conferred the benefit of (1) employees, (2) clients, and (3) years of market research and industry know-how upon Ohana and NextGen. The FAC provides ample proof supporting the benefits conferred:

> 20.    Aloha Toxicology has engaged in extensive marketing and research efforts to develop its business and client base ("Clients").

> 21.    In order to best serve its Clients, Aloha Toxicology invests substantial time, skill, and resources gathering, developing, and compiling information relating to individual Clients and their needs. Such information includes, but is not limited to, the types of services provided to and needed by each Client, particular preferences or characteristics of the Client, the pricing and fee structure best suited for the Client, financial data, and information regarding the history of Client accounts.

> . . .

> 23.    Aloha Toxicology's compilations of information (including Client lists), as well as its methods of operations (including cost and pricing information and marketing strategies) and processes (collectively "Trade Secrets") gives it an opportunity to obtain an advantage over competitors who do not know or use it.  The Trade Secrets derive independent economic value, actual and/or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use.  The Trade

Secrets have been developed only through Aloha Toxicology's experience and substantial efforts.

. . .

38.    At various times in 2018, Maki and Simbulan were setting up a new lab with NextGen and/or Ohana Genetics and were spending as little as one day a week working at Aloha Toxicology.  Maki and Simbulan represented to Aloha Toxicology employees that they were working on a research project at a "partner lab."

. . .

58.    Upon information and belief, all or a substantial number of Aloha Toxicology Clients moved their business to NextGen and/or Ohana Genetics in approximately June 2018.

59.    Upon information and belief, all or a substantial amount of NextGen and/or Ohana Genetics' revenue derives from Aloha Toxicology Clients.

60.    NextGen and Ohana Genetics knew or should have known that all or a substantial number of their Hawaii clients were Aloha Toxicology Clients.

. . .

62.    The conspiracy between Defendants has caused substantial irreparable harm to Aloha Toxicology, including the loss of over a decade of Client goodwill.
. . .

72.    Aloha Toxicology's Trade Secrets were misappropriated by one or more Defendants.

. . .

93.    Upon information and belief, NextGen and/or Ohana Genetics received Aloha Toxicology's Trade Secrets knowing the same to have

been stolen or appropriated, obtained, or converted without authorization.

. . .

117. Upon information and belief, NextGen and Ohana Genetics knew or should have known of, participated in, and/or ratified Maki and Simbulan's unfair competition.

. . .

123. Maki and / or Simbulan intentionally induced Aloha Toxicology's Clients to terminate their relationships with Aloha Toxicology and move their business to NextGen/Ohana Genetics.

124. Maki and / or Simbulan's intentional inducement of Aloha Toxicology's Clients to terminate their business relationships and move their business to NextGen/Ohana Genetics was not justified, because among other reasons, Maki improperly, secretly, without notice, without authorization, and without ratification terminated Aloha Toxicology's employees after misleading them regarding the purported closure of the lab and lack of interest in running the business by the owners.

. . .

141. NextGen and/or Ohana Genetics were unjustly enriched by receiving compensation from Aloha Toxicology Clients.

. . .

146. Upon information and belief, one or more Defendants may have destroyed potential evidence relevant to the Complaint.

FAC ¶¶ 20, 21, 23, 38, 58, 59, 60, 62, 72, 93, 117, 123, 124, 141, 146.

If the above facts are taken as true, and they must, the FAC demonstrates

that Plaintiff expended substantial efforts developing its business which included

its trade secrets, its clients, and its employees. These are actions taken by Plaintiff that benefit NextGen and Ohana.  NextGen and Ohana activity recruited Maki beginning in February of 2018, and through Aloha Toxicology's employees, Maki and Simbulan, began building Ohana's laboratory through the use of information obtained from Aloha Toxicology's employees, Maki, Simbulan, and Dr. Joe El-Khoury.  See Testimony of Heide Maki, Transcript of Proceedings on September 11, 2018, at p. 165:6 [ECF No. 50]. Furthermore, without the information and knowledge of Aloha Toxicology's employees as well as Aloha Toxicology's trade secrets, NextGen and Ohana would not have been able to obtain all of Aloha Toxicology's clients and employees.

The Motion should be denied because Aloha Toxicology conferred several benefits upon NextGen and Ohana, and NextGen and Ohana's retention of each of those benefits is momentously unjust.

## V.    **LEAVE TO AMEND FIRST AMENDED COMPLAINT.**

"Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment." Polich v. Burlington N., Inc., 942 F.2d 1467, 1472 (9th Cir. 1991).  "When exercising its discretion to deny leave to amend a court must be guided by the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the

pleadings or technicalities." <u>United States v. Webb</u>, 655 F.2d 977, 979 (9th Cir. 1981).

To the extent that any of Aloha Toxicology's claims are not adequately pleaded, Aloha Toxicology respectfully requests leave to amend the FAC consistent with the mandates of the Ninth Circuit.

## VI.    <u>CONCLUSION</u>

For the foregoing reasons and such other reasons as may be raised at the hearing, the Aloha Toxicology respectfully requests that the Motion be denied.

Dated:       Honolulu, Hawaii: <u>November 12, 2018.</u>

/s/ Mark G. Valencia
MARK G. VALENCIA
STEPHANIE M. SEGOVIA
**Attorney for Plaintiffs**
**WIHC LLC dba ALOHA**
**TOXICOLOGY**